# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **DR. WILLIAM W. ("BILL") GILHAUS,** ) | |
| **DR. CHRISTY ZIEGLER,** ) | |
| **LANA M. GERBER** ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| **GARDNER EDGERTON UNIFIED SCHOOL** ) | Case No. |
| **DISTRICT NO. 231,** ) | |
| **JOHNSON COUNTY, KANSAS,** ) | **JURY TRIAL DEMANDED** |
| Serve at: ) | |
| 231 E. MADISON ) | |
| GARDNER, KS 66030 ) | |
| ) | |
| and ) | |
| ) | |
| **ROB SHIPPY**, in his individual capacity, ) | |
| Serve at: ) | |
| 18520 Juniper St. ) | |
| Gardner, KS 66030 ) | |
| ) | |
| and ) | |
| ) | |
| **BRAD CHANDLER**, in his individual capacity, ) | |
| Serve at: ) | |
| 616 N. Cedar ) | |
| Gardner, KS 66030 ) | |
| ) | |
| and ) | |
| ) | |
| **TRESA BODEN**, in her individual capacity, ) | |
| Serve at: ) | |
| 732 N. Alder ) | |
| Gardner, KS 66030 ) | |
| ) | |
| and ) | |
| ) | |
| **MARY NELSON**, in her individual capacity, ) | |
| Serve at: ) | |
| 22005 S. Gardner Rd. ) | |
| Spring Hill, KS 66083 ) | |
| ) | |

and                                              )
                                                 )
**PAM STRANATHAN**, in her individual            )
capacity,                                        )
Serve at:                                        )
853 Fountain St.                                 )
Gardner, KS 66030                                )

              Defendants.

## COMPLAINT

        Plaintiffs Dr. William W. Gilhaus, Dr. Christy Ziegler and Lana M. Gerber, by and

through counsel, file their Complaint against defendants alleging as follows:

## JURISDICTION AND VENUE

        1.      This action arises under the Constitution of the United States; 42 U.S.C. § 1983;

and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*.

Jurisdiction over Plaintiffs' equal protection claim is based on 28 U.S.C. §§ 1331 and 1343(a),

and 42 U.S.C. §1983.  Jurisdiction over Plaintiffs' due process claims is based on 28 U.S.C. §§

1331 and 1343(a), and 42 U.S.C. § 1983.

        2.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).  All

defendants are citizens of Kansas, and reside within this judicial district.

## ADMINISTRATIVE PROCEEDINGS

        3.      All 3 plaintiffs were wrongfully discharged from employment on February 27,

2014.

        4.      On or about March 26, 2014, Plaintiff Christy Ziegler filed a timely Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC").

        5.      On or about March 28, 2014, Plaintiff Lana Gerber filed a timely Charge of

Discrimination with the Equal Employment Opportunity Commission ("EEOC").

6.    On or about April 10, 2014, Plaintiff William Gilhaus filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

7.    On or about December 15, 2014, the United States Department of Justice mailed to  Plaintiff Ziegler her Right-to-Sue Notice pursuant to Title VII.  A copy of the said notice is attached hereto as Ex. A and is incorporated herein by reference.

8.    On or about December 15, 2014, the United States Department of Justice mailed to the Plaintiff Gerber her Right-to-Sue Notice pursuant to Title VII.  A copy of the said notice is attached hereto as Ex. B and is incorporated herein by reference.

9.    On or about December 4, 2014, the United States Department of Justice mailed to the Plaintiff Gilhaus his Right-to-Sue Notice pursuant to Title VII.  A copy of the said notice is attached hereto as Ex. C and is incorporated herein by reference.

10.    This action has been filed in this Court within 90 days of all Plaintiffs' receipt of his or her Right-to-Sue notices from the Department of Justice.  Plaintiffs have therefore fully complied with all administrative prerequisites under Title VII before filing this action.

## **PARTIES**

11.     Plaintiffs Gilhaus, Ziegler and Gerber are residents of the State of Kansas who were employees of defendant Gardner Edgerton Unified School District No. 231, Johnson County, Kansas ("USD No. 231").  During all relevant times, plaintiffs met the definition of "employee(s)," and were "individual(s) employed by an employer" as defined by 42 U.S.C. § 2000e(f).

12.    USD No. 231 is defined as a school district under Kansas law, and USD No. 231 may be subject to lawsuits. USD No. 231, by and through its official Board, is a body organized under Kansas law, that performs functions under color of law for purposes of 42 U.S.C. § 1983.

USD No. 231 is also an "employer" under Title VII, 42 U.S.C. § 2000e(b), that is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

12.    Defendant Rob Shippy is a member of the Board of Education of USD No. 231. Shippy is a citizen and resident of the State of Kansas who may be served at his residence at 18520 Juniper St., Gardner, Kansas 66030-9101.  Shippy is being sued in his individual or personal capacity, and not in his official capacity.  Shippy intentionally, recklessly or maliciously deprived plaintiffs of constitutional rights under color of state law.

13.     Defendant Brad Chandler is a member of the Board of Education of USD No. 231.  Chandler is a citizen and resident of the State of Kansas who may be served at his residence at 616 N. Cedar, Gardner, Kansas 66030-9101. Chandler is being sued in his individual or personal capacity, and not in his official capacity.  Chandler intentionally, recklessly or maliciously deprived plaintiffs of constitutional rights under color of state law.

14.    Defendant Tresa Boden is a member of the Board of Education of USD No. 231. Boden is a citizen and resident of the State of Kansas who may be served at her residence at 732 North Alder, Gardner, Kansas 66030-9101. Boden is being sued in her individual or personal capacity, and not in her official capacity.  Boden intentionally, recklessly or maliciously deprived plaintiffs of constitutional rights under color of state law.

15.    Defendant  Mary Nelson is  a member of the Board of Education of USD No. 231. Nelson is a citizen and resident of the State of Kansas who may be served at her residence at 22005 S. Gardner Rd., Spring Hill, Kansas 66083. Nelson is being sued in her individual or personal capacity, and not in her official capacity.  Nelson intentionally, recklessly or maliciously deprived plaintiffs of constitutional rights under color of state law.

- 4 -

16.    Defendant  Pam Stranathan is employed as the top administrative officer of USD
No. 231.  Stranathan is a citizen and resident of the State of Kansas who may be served at her
residence at 853 W. Fountain St., Gardner, Kansas 66030.  Stranathan is being sued in her
individual or personal capacity, and not in her official capacity.  Stranathan intentionally,
recklessly or maliciously conspired with one or more of the individual defendants so as to
deprive plaintiffs of constitutional rights under color of state law.

## GENERAL ALLEGATIONS AS TO ALL CLAIMS

17.    Plaintiff Bill Gilhaus was recruited to become Superintendent of the Gardner
Edgerton School District 231 in 2004.  Gilhaus was recruited with the express directive to
elevate the District into the upper ranks of Kansas schools.  Gilhaus recruited talented, dedicated
administrators and educators (including plaintiffs Ziegler and Gerber), and delivered as
requested.  Gilhaus holds a doctoral degree, and has risen through the ranks of school
administration to reach its highest levels.  Under Dr. Gilhaus' leadership, the Gardner Edgerton
School District achieved a ranking as 3rd in the top 10 city metropolitan districts; the District
earned 32 Governor's Achievement Awards, given to schools in the top 5% of state performance
measures; student achievement increased in both math and reading from 65% to 96% proficiency
on the Kansas Assessment Test; under Gilhaus' leadership, the District achieved two successful
Bond votes, well supported by the community, that provided more than $120 million in new
construction, including 5 new schools.

18.    Plaintiff Dr. Christy Ziegler was hired by defendant school district in February,
2005.  Her title at the time of her termination was Executive Director of Educational Services.
Throughout Ziegler's successful career with the school district, she received all favorable
evaluations.  She had zero disciplinary actions during her employment.  Based on her

- 5 -

performance, her written contracts were renewed every year, and she received several promotions.  Dr. Ziegler had an expectation of continued contractual renewals based on her performance.

19.    Plaintiff Lana Gerber was hired by defendant school district in July, 2004.  Her title at the time of her termination was Executive Director of Administrative Services. Throughout her entire tenure with defendant school district, Gerber received all favorable evaluations.  She had zero disciplinary actions during her employment. Based on her performance, her written contracts were renewed every year, and she received several promotions.  Ms. Gerber had an expectation of continued contractual renewals based on her performance.

20.    Ron Ragan is a respected member of the Gardner Edgerton community.  He served many years on the USD No. 231 Board of Education, last holding the office of President. In 2014, Mr. Ragan provided this statement of his personal knowledge regarding the successful tenure of plaintiffs:

> "In regard to the past performance at the USD No. 231 of Dr. Gilhaus, Dr. Ziegler, and Lana Gerber, under their leadership along with the support staff, administration and teachers USD No. 231 excelled above and beyond my expectations over the eight years I served on the Board either as a Board member or as the Board president until my term ended June 2013.  Under their leadership this district successfully passed two major bond issues to support the growth of this district from a small district to  a 6A district.  During that time this district garnered 32 Governor's Achievement Awards which are bestowed on the Top 5% of all schools in the State of Kansas.  USD 231 was ranked #3 out of the Top 5 Metro School Districts and USD 231 was ranked in the 'best high schools of America'...in both 2012 and 2013.  When you compare these results to other Metro districts it is even more impressive.  This district achieved success at all levels elementary, middle school and the high school level from academic to extracurricular activities without exception."

**Spring 2013: Gilhaus Announces His Plan to Retire ─ But USD 231 Recruits Him Back**

21.     In the Spring of 2013, plaintiff Gilhaus had announced his intent to retire effective at the then upcoming May 16, 2013 Board of Education meeting.  However, the Board of Education pursued Dr. Gilhaus to extend his employment, and unanimously voted to rehire him by utilizing what was then a new Kansas State Statute, enacted to allow such rehirings to happen. To quote a public statement issued by the defendant district at the time:

> "USD 231 has utilized the  Kansas Statute that permits school districts to retain and benefit from experienced personnel who might otherwise have sought employment in other districts, said Ron Ragan, President of the Board of Education. 'The approved agreement between Dr. Gilhaus and Ms. Amos and the USD Board of Education are at a lower total cost to the tax payers of USD 231 than their previous contracts.'"

22.     Dr. Gilhaus' initial retirement was initially targeted for the end of the 2012-2013 school year.  But state statute allows public employees who have the ability to retire and receive their publicly funded retirement (known as "KPERS") to be rehired by the same school district after 60 days.  Before 2009, such a rehiring was not allowed.  The Board unanimously voted to rehire Gilhaus.

**USD 231 Negotiates A New Contract With Gilhaus**

23     Following express and unanimous intention of the Board of Education as it was comprised at the time, Gilhaus negotiated at arm's length a new two-year and 10-month written contract.  A true and accurate copy is attached hereto as Ex. D, and its entire content is incorporated by this reference.  This contract contains clear-cut preconditions for any attempted termination of Gilhaus' employment before the contract's expiration.  Specifically the contract could only be terminated if:

"(i)     The terms hereof are materially breached by the Superintendent;

(ii)     USD 231 is deemed insolvent;

> (iii)    The Superintendent is incapable, due to illness, accident or other cause beyond his control, to substantially perform his duties hereunder for a period of more than 6 consecutive months;

> (iv)    The Superintendent engages in conduct which is seriously prejudicial to the operations in the District....; provided, however, that before the Board terminates this contract on that basis, it shall first provide the Superintendent with written notice of the    grounds for the proposed termination, and an opportunity for the Superintendent to be   heard by the Board (in an Executive Session of the Board) as to why the Superintendent  did not engage in the alleged conduct, or why this contract should not be terminated."

The Superintendent also could terminate the contract, but the contract document provides reciprocal (and unequivocal) due process rights for both sides, in ¶13:

> "Prior to termination by either party due to a breach of this contract, written notice of the breach shall be given to the party alleged to be in breach, and a reasonable opportunity must be afforded for the breach to be cured."

None of the foregoing conditions ever happened.  Thus the premature termination of Dr. Gilhaus' contract was not allowed under express wording of said contract.

### Spring/Summer 2013:New Members Are Elected and Appointed to the Board of Education

24.    Individual defendants Rob Shippy and Brad Chandler were elected to the Board of Education in April, 2013.  They assumed office as of July 1, 2013.  Individual Defendants Mary Nelson and Tresa Boden were appointed to the Board in September, 2013, after resignations by more experienced Board members.

25.    During the 2013 summer vacation, between Dr. Gilhaus' retirement, and his rehiring after a required 60 day waiting period had passed, plaintiff Christy Ziegler was unanimously appointed by the Board as Interim Superintendent.  Plaintiff Lana Gerber continued in her role as Executive Director of Administrative Services.

**Dr. Ziegler and Ms. Gerber Experience Intentional, Purposeful Sex Discrimination**

26.     Beginning in the spring of 2013 and continuing into the summer of 2013, both Shippy and Chandler engaged in sexually discriminatory, demeaning, bullying, unwelcome sexually charged conduct directed toward both Dr. Ziegler and Ms. Gerber.

27.     Both plaintiffs Ziegler and Gerber experienced a continuing course of intentional discriminatory conduct at the hands of Shippy and Chandler.  Ms. Gerber states that beginning with the July 22, 2013 Finance meeting, Rob Shippy "made me uncomfortable with leering stares."  Mr. Chandler "commented on my skirt, how I dress, and how he liked how I looked."  Ms. Gerber continues that Shippy continually made belligerent comments questioning the salary of administrators, and how he wanted to take care of certified staff before moving on to the administrators.  Plaintiff Gerber alleges:  "He was chauvinistic and bullying in his interactions with me."

28.     On July 29, 2013, Shippy made public statements that were degrading, and in reckless disregard of the truth, concerning the administration of the USD No. 231 school district, calling them in public "reckless and irresponsible."  Gerber requested a meeting with Shippy (August 6, 2013), to try to explain staffing decisions in the district.  But before she could talk, Shippy interrupted saying, "I know more than you know."  Shippy then continuously interrupted plaintiff Gerber and, as in all previous encounters, "made me uncomfortable with his long leering stares, looking me up and down...."  During the meeting of August 6, 2013 Shippy continually leered at Ms. Gerber, and called her "Sweetie," capped off with his most dismissive and condescending comment: "Sweetie, I have been in this district long before you, and I will be in it long after you are gone."  Gerber was extremely humiliated and threatened, and considered his

comment to be sexually harassing, and contributing to creating a hostile environment for Ms. Gerber as a female.

29.     Dr. Christy Ziegler had interactions with Shippy and Chandler in June, July, August and September, 2013.  During those months, "Mr. Shippy began a series of various interactions and meetings with me."  Shippy would make vague comments about unidentified "people" supposedly disagreeing with certain Board policies.  But he never identified "who" expressed concern; nor what specifically had been said.  On July 1, 2013, the newly elected Board of Education members (including Shippy and Chandler) took office.  Thereafter, Shippy continually made aggressive and woefully misinformed comments to Ms. Ziegler about "rumored" compensation or benefits:  Suggesting, for example, that bond dollars "paid" for Dr. Gilhaus' pool — which was ludicrous; or that the school district directly "paid" the Superintendent's utility bills — also ludicrous.

30.     Dr. Ziegler was present on August 6, 2013 in Lana Gerber's office when Shippy was bullying, chauvinistic and verbally aggressive toward both Ziegler and Gerber.  As Dr. Ziegler corroborates, Shippy called us "Ladies" and "Sweetie,"  loudly proclaiming to Lana Gerber:  "I have been in this district long before you, and I will be in it long after you are gone." Shippy was "very threatening and chauvinistic toward us as females."  As Ziegler states in her Charge of Discrimination: "Each and every encounter I had with Mr. Shippy, he would stare me up and down in a degrading, demeaning and threatening way.  He continually made his intimidating and degrading comments, challenging my position and decision-making capabilities.  His demeanor and tone were aggressive," and Dr. Ziegler learned that he did not use that discriminatory tone with male employees of the district.

31.    Ms. Gerber was subjected to sexually harassing comments by new Board member Brad Chandler on January 28, 2014 during a Planning Committee Meeting. Outside contractors were in attendance. While discussing new updates to the tennis courts, and talking about a tennis equipment shed, Chandler interrupted Lana Gerber in front of the entire group, stating, "Don't you think we should call it the love shack?" He repeated that crude and uninvited comment 3 times. Chandler's statement was sexually charged and highly inappropriate. Others in the meeting (including outside contractor representatives) showed their disapproval as well, by sarcastically telling Mr. Chandler, "Yeah, we get it."

32.    On February 10, 2014, Lana Gerber attended a Board of Education meeting. The Board left for Executive Session, and Ms. Gerber was to attend. Upon arrival, Ms. Gerber was unsure where to sit, so as she chose her seat before the meeting began and Mr. Chandler came over to sit next to her. Ms. Gerber made a joking comment to the effect, "Looks like you have to sit next to me; you must have drawn the short straw." Chandler's easily-heard inappropriate response was, "How do you know I have a short straw? I take personal offense to that ha ha ha (laughing)." Defendant Shippy heard the disrespectful comment, and immediately joined in the laughter. The inappropriate and embarrassing statement made by Chandler, and the approving laughter from Shippy was perceived as not only sexual harassment to Ms. Gerber as a female, but as highly improper behavior for Board members.

33.    Eventually both Ziegler and Gerber commiserated with each other about their respective mistreatment, both expressing to each other their angst and fear about the possible ramifications if they should report this illegal misbehavior.

34.    Both plaintiffs Gerber and Ziegler fervently hoped and prayed that the sexually demeaning misconduct of Shippy and Chandler would diminish, or better still, just stop.

Unfortunately, it did not.  In <u>early</u> February, 2014, both Ziegler and Gerber separately reported their growing concerns to Superintendent Gilhaus: on February 5 -6, 2014; and again on February 12, 2014.  Gilhaus gave specifics to the Board's President and Vice President during Gilhaus' evaluation meeting on February 13, 2014.  This was the second time Gilhaus brought the misconduct to the Board President's attention.  Gilhaus then  made sure that Board officers, Board counsel (then Joe Hatley) and the <u>entire</u> Board received full and proper notice of these serious charges.  Board attorney Joe Hatley immediately initiated steps necessary for an internal investigation under existing practices and procedures.

35.    On February 26, 2014, both Ziegler and Gerber separately filed formal written complaints.  Per protocol, everything was duly communicated to Board counsel, who immediately sent an e-mail (with complaint copies) to the entire Board of Education.

**<u>February 27, 2014: Plaintiffs Are Illegally Ousted From Employment For No Cause, During An Illegal "Special" Board Meeting</u>**

36.    New Board members Shippy, Chandler, Boden and Nelson were part of the conspiracy leading up to the wrongful public ouster of the 3 highly-regarded plaintiffs. Defendant Pam Stranathan, was at that time working for the school district under the supervision of plaintiffs Ziegler and Gerber.  Stranathan had received a series of documented performance deficiencies ─ communicated via a letter of reprimand, plus Stranathan's annual evaluation documents.  Before the February 27, 2014, meeting, Stranathan was informed beforehand of the secret but intentional plan to vote to prematurely end the employment of Gilhaus, Ziegler and Gerber.  Stranathan stood to gain personally in the planned ouster of Dr. Gilhaus, Dr. Ziegler and Ms. Gerber.

37.    At 4:24 a.m. on the morning of February 27, 2014, defendant Shippy sent a public Facebook posting regarding the hastily and improperly announced "Special' Board meeting:

**"Meeting this evening will be exciting.  Special meeting called by 3 BOE Members, Boden, Shippy, Nelson at 6:00 p.m."**

This posting was sent to persons <u>outside</u> of the Board of Education.  The communication excluded at least 3 Board members, yet directly concerned Board of Education personnel matters. One recipient of the message asked what the excitement may be, to which Shippy replied:

**"All about special people.  It should be worth attending."**

38.    Although Lana Gerber and Christy Ziegler regularly attended Board of Education meetings, they were specifically told NOT TO ATTEND this specially called Board of Education meeting.   At previous meetings, the 4 new members had treated Gerber and Ziegler very rudely and aggressively for no good reason.  There was nothing disclosed on the agenda that required their attendance.  In fact, the 3 experienced Board of Education members ─ including President Granell and Vice-President Repshire ─ had no inkling whatsoever beforehand about the preconceived personnel actions planned by Shippy and his co-conspirators, nor did Board attorney Joe Hatley.  For that reason, Board attorney Joe Hatley, therefore, publically challenged the legality of the meeting during open session on February 27, 2014.

39.    As proof positive that there was much secret discussion beforehand ─ including probable violations of the Open Meetings Act by virtue of the 4 new Board members knowing beforehand the subject of the special Board meeting ─ that night's attendance at the Board meeting was standing room only, the largest crowd Superintendent Bill Gilhaus had ever seen.

40.    Board attorney Hatley stated several times during the opening public portion of the meeting that in his opinion this was "<u>not</u> a legal meeting," as the topic for discussion of the "Special" Board meeting had <u>not</u> been properly and timely identified for all members of the Board of Education.  Defendant Shippy (astoundingly) said something like, "Shut up, you work

for me, I'm tired of your opinions."  Hatley responded, "Mr. Shippy, this is not my opinion, it is

Kansas statute law, and I'm trying to keep you from getting your butt sued off."

41.    After public debate, the Board left the public meeting and held Executive Session

for 1 1/2 hours.  Dr. Gilhaus was excused to his office during Executive Session,  The seven (7)

Board members then returned to open session and took an immediate vote to terminate

Superintendent Dr. Bill Gilhaus, Executive Director of Administrative Services Lana Gerber and

Executive Director of Educational Services, Dr. Christy Ziegler.  Immediately after the 4-3 vote

to terminate the 3 plaintiffs, Pam Stranathan was named Interim Superintendent — despite the

fact that she had various noted and documented performance deficiencies and despite her total

lack of relevant administrative experience.

42.    By a 4-3 vote, the 3 plaintiffs were fired — without notice, without cause, without

required due process, all in blatant and conscious disregard of their 3 binding contracts with the

District.  Defendants Shippy, Chandler, Boden and Nelson voted to terminate; Board members

Repshire, Grannell and Mary Herbert voted against termination.

43.    Plaintiffs have learned that during Executive Session the Board was on notice

from Donna Whiteman — outside attorney and Executive Director of Legal Services for the

Kansas Association of School Boards — who told the Board and Hatley (via speaker phone) that

the proposed actions in terminating the 3 plaintiffs were not legal.   She repeatedly noted "Dr.

Gilhaus is a highly respected Superintendent," and she "strongly advised against" the planned

firings.  Ms. Whiteman warned the Board, "You will be placing yourselves and the District in a

position of liability, with a likely lawsuit following."

**Intentional Terminations With Full Knowledge of Absence of Cause; No Due Process**

44.    The Board sent the President (Mark Grannell), the Vice-President (James Repshire), and Board attorney Joe Hatley to inform Gilhaus that all 3 had been terminated.  Bill Gilhaus specifically asked, "Was a reason given?" The response was: **"There was none."** Gilhaus observed that this sneak attack took place "without due process," (such as is built into his contract and required by law) ─ and the 3 unanimously agreed with him: "We told them...." Gilhaus commented, "So no due process, and no reason.... Are they aware of the consequences?" The Board members and their attorney all of whom were sent to deliver the messages as Board spokespersons ─ said collectively: **"They don't care."**

45.    Thereafter, both Christy Ziegler and Lana Gerber received nearly identical information after Gilhaus had, by telephone.  Importantly, all 3 plaintiffs were expressly told that the Board would be advised that there was "no legal reason" to withhold paying out <u>all</u> of the remainder of <u>all</u> of their contracts.  This would include Dr. Gilhaus' contract which still had 2 years remaining.  The contracts of Dr. Ziegler and Ms. Gerber ran through June 30, 2014.  Both Ziegler and Gerber likewise asked for the grounds for termination; both were told there were "none."  Both were told that the Board would be told to pay out in full the remainder of their contracts.

46.    All 3 plaintiffs had been given sterling formal evaluations a mere 2 weeks before the illegal firings.  Gilhaus and Gerber had 10 years of similarly exemplary evaluations; Ziegler had 9 previous years of the same.

**PURPOSEFUL, MALICIOUS INTENT TO HARM REPUTATIONS**

47.    It is undisputed  that in education the standard practice is to not "fire" employees in the middle of a contract term ─ unless they are guilty of the most severe and still threatening

misconduct ─ such as improper sexual behavior; or committing a crime involving dishonesty or moral turpitude and unfitness. Even in those extreme circumstances, most often employees of educational institutions are given the option of resigning. Or they might be "non-renewed," with full explanations given to them beforehand as to why, plus the option to resign. No such consideration was given to Gilhaus, Ziegler or Gerber. It is well known in education ─ and should have been well known to the individual defendant Board members ─ that employees of school districts cannot be fired without receiving due process <u>before</u> termination.

48.    In fact, when numerous news stories began to run regarding the public terminations, Board member Rob Shippy was filmed (at his home) making the palpably false public statement that there was **"just cause"** for the terminations. Shippy's statement was knowingly false, yet it was quoted in an online article posted on KSHB (Channel 41) website. News stories ran on channels 9, 5, 4 and 41 within the Kansas City Metropolitan area, and (in print version) appeared in <u>The Kansas City Star</u>, <u>The Topeka Capitol Journal</u>, <u>Emporia Gazette</u>, <u>Hays Post</u>, and <u>Gardner Edge</u>. Cities such as Nashville, Tennessee picked up the story ─ as did Phoenix, Arizona and Washington, D.C.

49.    Board member Chandler was heard asking "Where the news [media] are....The news is supposed to be here." Obviously widespread publicity was pre-planned by Chandler, Shippy and others.

50.    Board attorney Joe Hatley soon thereafter resigned as Board attorney, as did his firm ─ the well-regarded, long-established law firm Spencer Fane Britt and Browne. A new lawyer was hired who gave immediate advice to "stop payments" on the contracts. The district made a conscious, deliberate, intentional decision to stop paying on written contracts, for which

there was absolutely no legally-supported excuse or justification for said non-payment.  This triggered liability under Kansas Statute K.S.A. §44 - 313-316.

51.     It was reported in a public news article that during a meeting of the Board of Education on March 10, 2014, Board member Brad Chandler, who had voted to fire the 3 plaintiffs, challenged a public citizen who criticized the baseless firings.  Chandler said words to the effect,  "I'd like to add, you forgot a couple of things about including the divide that he [Bill Gilhaus] drove into many people around here and many staff that we lost because of him."  That statement was false, yet had the deliberate purpose and effect of intentionally publically harming Gilhaus' reputation.

52.     By virtue of the explicit wording of Bill Gilhaus' contract, whatever "disagreements" or "grievances" or differences of opinion the Board members believed they had with respect to Gilhaus' management performance, all such challenges should have been put in writing and brought to his attention before any Board votes, so he could address them.  No such opportunity was ever presented, such that the Board action was taken under color of state law, and was in reckless disregard of plaintiffs' due process property and liberty interests.

53.     To date, no one connected with named defendants has ever disclaimed or publically retracted the blatantly false and infinitely destructive and stigmatizing statement, that there was "just cause" for the terminations.  Both Christy Ziegler and Lana Gerber were unemployed for the first time in their careers.  Both have since obtained reemployment — but both have taken backward steps in their careers.  Both will earn less money throughout the many years left in their careers as educators.

54.     Lana Gerber was forced to sell her family home.  Persons who had initially freely agreed to write letters of recommendation for Ms. Gerber quickly reversed themselves — based

on directives from the defendant school district.  One person in particular said that she had "just been given information today that due to current circumstances and directives from legal counsel, I am limited to all correspondence and communication until further notice. Unfortunately, I won't be able to write you a letter of recommendation.  I'm sorry, but I wanted you to know."

55.     Lana Gerber learned from the Leawood Middle School Principal, where Gerber eventually gained employment as a Principal, that she had "fielded phone calls and e-mails from parents who were upset that Leawood hired a person who was publically terminated in mid-year in an area district."  Such an overreaction stems directly from the misinformation made public by the district and the conspiring defendants as to the supposed "just cause" for terminations — when in fact there was no cause.

56.     Defendants' actions have ostracized plaintiffs from members of their community, and have harmed plaintiffs' reputations and their ability to maintain the career positions they had achieved.

57.     The firings took place after attorney Hatley had notified all Board members that the claims by Gerber and Ziegler against two Board members could constitute sex discrimination, hostile environment, and sexual harassment.

## COUNT I
## Due Process Violations - Fourteenth Amendment, 42 U.S.C. § 1983
### (All Plaintiffs Against All Defendants)

58.     Plaintiffs Gilhaus, Ziegler and Gerber reallege and incorporate by reference each and every allegation of this Complaint as though fully set forth herein. Plaintiffs also incorporate herein all allegations in paragraphs that follow this Count I as though fully set forth herein.

59.    None of the plaintiffs were employees at-will.  To the contrary, all plaintiffs had the full expectation of continued employment based on written contracts that specified terms and duration, and based on established due process property rights.

60.    The Fourteenth Amendment of the Constitution of the United States prohibits any person under color of law from depriving "any person of life, liberty or property without due process of law."  See also 42 U.S.C. §1983.  All plaintiffs possessed the established legal right to notice and hearing <u>before</u> deprivation of their respective "property interests" in their continued employment and entitlement to their jobs.  Plaintiffs possessed the established constitutional right for a hearing <u>before</u> termination from their positions with the defendant school district.

61.    Plaintiffs have no requirement to exhaust any administrative remedies as a prerequisite to bringing an action under 42 U.S.C. §1983.

62.    All of the individual defendants knew or should have known that it was clearly established in law that the plaintiffs could <u>not</u> be summarily discharged without due process <u>before</u> discharge.  As described in paragraphs 43-44, the 4 individual defendants were repeatedly and emphatically <u>forewarned</u> by competent attorneys Hatley and Whiteman that their actions were in direct opposition to law, and their strong legal advice.  Nonetheless, the individual defendants misused the power conferred upon them by virtue of state law, by ignoring restrictions and limitations on their discretionary power.  These individual defendants thus acted in knowing or reckless disregard and abuse of their power to act under "color" of state law.

63.    These defendants knowingly, willfully or with reckless disregard for the 3 plaintiffs' due process property interest, denied the plaintiffs the opportunity to be heard at a meaningful time in a meaningful manner <u>before</u> plaintiffs' wrongful and public discharge from employment.

- 19 -

64.     These plaintiffs also possess, in addition to their due process property interests, a liberty interest in due process.  An employee's liberty interest are implicated where the employer levels accusations at the employee that are damaging so as to make it difficult or impossible for the employee to escape the stigma of those charges.  Plaintiffs know for a fact they have suffered stigmatizing allegations in the context of the employer discharging them in the middle of the school year, while their contracts should have guaranteed continued employment.  Such actions stigmatized the plaintiffs so as to seriously damage their standings and associations in the community, or foreclosed freedom to take advantage of other employment opportunities. Discovery should reveal the extent of negative and stigmatizing accusations that defendants made about them in public communications from which plaintiffs were excluded.

65.     Plaintiffs' right to be heard at a meaningful time and in a meaningful manner before discharge from employment was clearly established in the law at the time of plaintiffs' termination, all of which should have been reasonably known to the individual defendants.

66.     Plaintiffs'  have the right to a "name clearing hearing" to be heard by an impartial tribunal, after their discharge from employment.  This right was clearly established in law at the time of plaintiffs' illegal termination.  All of this should have been reasonably known by the individual defendants.

67.     Defendant USD No. 231 denied plaintiffs the opportunity of a name clearing hearing to be heard by an impartial tribunal.

68.     Defendant USD No. 231, and the individual defendants acted under color of statute, ordinance, regulation, custom or usage of the State of Kansas.  Defendants jointly and severally caused plaintiffs to be denied and deprived of rights, privileges or immunities secured by the Constitution and laws of the United States. namely, deprivation of due process property

- 20 -

and liberty interests guaranteed by the Fourteenth Amendment to the Constitution of the United States. Those constitutional deprivations give rise to this lawsuit under 42 U.S.C. §1983.

69. As a direct and proximate result thereof, and because of the extremely damaging and stigmatizing actions and statements made by the individual defendants leading up to and surrounding plaintiffs' premature public discharge, the good name of all plaintiffs, and their reputations in their fields have been substantially and permanently stigmatized and damaged, with consequent foreclosure or hindrance of their securing comparable future employment opportunities in the educational administration field.

70. In particular, Superintendent Bill Gilhaus has been unable to secure comparable employment. And in view of his having risen to the highest ranks of educational administrators within Johnson County, Kansas, his prospects for obtaining comparable reemployment to what he has lost are substantially harmed.

71. The individual defendants jointly and severally are liable for all violations set forth herein, because they were willing participants in joint activities with each other, and by virtue of being clothed with the authority of state law they conspired to deny plaintiffs their constitutional rights.

72. Defendant Pam Stranathan is liable in her individual capacity, because she conspired with the school district and the other individual defendants to be ready to "step in" as Interim Superintendent, and she agreed to do so with full knowledge of the impending public terminations.

73. The defendant USD No. 231 is liable for the actions taken against plaintiffs because complained-of actions, customs, and/or policies described herein were created,

implemented, approved and/or ratified by defendant USD No. 231 as the overall governing body for the school district.  As such the school district is the final policymaking authority.

74.     Individual defendants herein acted with evil motive or in reckless indifference to the rights of plaintiffs, thereby entitling plaintiffs to an award of punitive damages, in such amounts as will punish defendants and deter these defendants and others from like conduct.

75.     As a direct result of defendants' unlawful acts as described herein, plaintiffs have suffered substantial harms and losses that will exceed millions of dollars, including but not limited to past and future lost wages and benefits, emotional and mental distress, career disruption, harm to reputations.

Wherefore, the plaintiffs pray for judgment, after jury trial, awarding each plaintiff any and all actual damages and losses shown in evidence to be sustained by Dr. Gilhaus, Dr. Ziegler and Ms. Gerber, as determined by the jury to be fair and reasonable, for prejudgment interest, for punitive damages, for attorneys' fees, costs and expenses, and for all other damages and losses incurred herein and for such other relief as the court deems just and proper.

## COUNT II
### Equal Protection  – Fourteenth Amendment, 42 U.S.C. § 1983
### (Plaintiffs Ziegler and Gerber Against Defendant USD No. 231; Shippy; Chandler)

76.     Plaintiffs Ziegler and Gerber, as females, bring this action under the Fourteenth Amendment for violation of their rights to equal protection of the laws as guaranteed by the Fourteenth Amendment of the Constitution and under 42 U.S.C. §1983.  Plaintiffs Ziegler and Gerber bring this action against the defendant district USD No. 231 and individual defendants Rob Shippy and Brad Chandler.

77.    Plaintiffs  reallege and incorporate by reference each and every allegation of this Complaint as though fully set forth herein. Plaintiffs also incorporate herein all allegations in paragraphs that follow this Count II, as though fully set forth herein.

78.    The action of these defendants during these female plaintiffs' employment, and in terminating their employment deprived plaintiffs of the equal protection of the laws as guaranteed by the Fourteenth Amendment of the Constitution,  as actuated for a lawsuit under 42 U.S.C. §1983.

79.    The defendants deprived female plaintiffs Ziegler and Gerber of the full benefits of employment enjoyed by male employees of the district because of their sex and/or gender.

80.    The defendants treated plaintiffs Ziegler and Gerber differently than other male employees of the district because of their sex and/or gender.  Specifically, Shippy and Chandler did not leer at male employees; nor did they treat them in the bullying and demeaning way Ziegler and Gerber suffered.

81.    The actions and conduct of the perpetrators as set forth herein created a sexually hostile, offensive and intimidating work environment, and detrimentally affected plaintiffs.

82.    The actions and conduct by the above described perpetrators were severe or pervasive, and based on the sex of the plaintiffs as females.  The misconduct constituted unlawful, intentional discrimination based on sex and/or gender.  The actions and conduct described herein would have detrimentally affected a reasonable person of the same sex as plaintiffs.

83.    Defendant USD No. 231 was the employer and final policymaking authority. That defendant knew or should have known of the sexual harassment and sexual discrimination. The individual defendants are directly liable, because as Board members they wielded power to

influence decisions of the Board that ultimately resulted in the illegal terminations of these plaintiffs.  Plaintiff allege direct, and not vicarious, liability against Shippy, against Chandler and against USD No. 231.

84.    The defendant school district is directly liable for the actions against plaintiffs, because the complained of actions, customs and/or policies described herein were created, implemented, approved and/or ratified by defendant Board, which had the final policymaking authority for the district.  Instead of taking action to stop the misconduct, Shippy and Chandler caused the Board to  vote to fire these plaintiffs.

85.    These defendants intentionally discriminated and retaliated against the plaintiffs. Plaintiffs' sex and/or gender was a motivating factor in defendants' decisions taken under color of law to treat plaintiffs differently than other similarly situated male employees.  Their decision to terminate employment amounts to sex discrimination.  Because the firings occurred under color of law after plaintiffs objected to the discrimination, the defendants retaliated in violation of law.

86.    As a direct result of defendants' unlawful acts as described herein plaintiffs have suffered substantial harms and losses, including but not limited to past and future lost wages and benefits, emotional and mental distress and career disruption.

87.    The defendants acted under color of law, but with evil motive or reckless indifference to the rights of plaintiffs, thereby entitling plaintiffs to an award of punitive damages in an amount that will punish these defendants and deter defendants and others from like conduct.

Wherefore, the plaintiffs pray for judgment, after jury trial, awarding each plaintiff any and all actual damages and losses shown in evidence to be sustained by Dr. Ziegler and Ms. Gerber, as determined by the jury to be fair and reasonable, for prejudgment interest, for punitive

damages, for attorneys' fees, costs and expenses, and for all other damages and losses incurred herein and for such other relief as the court deems just and proper.

**COUNT III**
**42 U.S.C. § 2000e – Discrimination and Retaliation**
**(All Plaintiffs Against Defendant USD No. 231)**

88.     Plaintiffs  reallege and incorporate by reference each and every allegation of this Complaint as though fully set forth herein. Plaintiffs also incorporate herein all allegations in paragraphs that follow this Count III as though fully set forth herein.

89.     This Count is by all 3 plaintiffs against defendant USD No. 231.  Defendant's actions during Plaintiff's employment and up through termination amounted to illegal discrimination and retaliation under Title VII, 42 U.S.C. §2000e.

90.     All 3 plaintiffs engaged in protected activity by complaining of the sex discrimination and hostile environment Shippy and Chandler caused as set forth herein.

91.     Plaintiffs had a good faith, reasonable belief that they were opposing illegal sex discrimination by  USD No. 231, caused by the actions and comments of Board members Shippy and Chandler.

92.     Plaintiffs suffered adverse employment actions when defendant USD No. 231 wrongfully terminated their employment.

93.     A sufficient causal connection exists between Plaintiffs' protected activity and the adverse employment actions, as demonstrated by the temporal proximity between the protected activity and the adverse action.

94.     At all times mentioned herein, before, during and after, the above-described perpetrators Shippy and Chandler were the alter-ego of defendant USD No. 231.   They were at all times acting within the scope and course of their agency, or their actions were expressly

authorized or later ratified and condoned, by USD No. 231.  Therefore, USD No. 231 is liable for the actions of said perpetrators under all theories pled herein.

95.     USD No. 231 has intentionally retaliated against Plaintiffs for their bringing forward complaints of sex discrimination and harassment against defendants Shippy and Chandler.

96.     Plaintiffs' complaints consist of protected activities under Title VII.

97.     As a direct result of USD No. 231's unlawful retaliation, Plaintiffs have suffered damages, including substantial lost wages and benefits, and emotional distress.

Wherefore, all 3 plaintiffs pray for judgment, after jury trial, awarding each plaintiff any and all actual damages and losses shown in evidence to be sustained by Dr. Gilhaus, Dr. Ziegler and Ms. Gerber, as determined by the jury to be fair and reasonable, for prejudgment interest, for punitive damages, for attorneys' fees, costs and expenses, and for all other damages and losses incurred herein and for such other relief as the court deems just and proper.

### COUNT IV
### Breach of Express Contracts
### (All Plaintiffs Against Defendant USD No. 231)

98.     Plaintiffs  reallege and incorporate by reference each and every allegation of this Complaint as though fully set forth herein. Plaintiffs also incorporate herein all allegations in paragraphs that follow this Count IV as though fully set forth herein.

99.     All 3 plaintiffs entered into properly and fairly negotiated written contracts with the defendant USD No. 231.

100.     As stated, plaintiff Bill Gilhaus' contract is attached hereto as Ex. D and incorporated by this reference.  The term of his contract commenced September 2, 2013 and would not end until June 30, 2016.  The contract had extension clauses.   By virtue of his past

performance, Gilhaus had every expectation that even after the final year of the contract, his employment should have been renewed.  Defendant maliciously breached contract by terminating Bill Gilhaus without the proper notice or following the provisions of ¶13 as set forth above.  In addition, Bill Gilhaus has been refused to participate in the district's health insurance plan, when every other employee has been allowed to do so when they retire from the district.  Post-termination benefits have been breached.  Gilhaus has suffered dollar damages from the breach of contract which will be proven in evidence after discovery, but which he estimates at this time to be at least $580,000.

101.     Dr. Christy Ziegler signed a contract each and every year of her employment.  Before her illegal termination, she entered into a contract in the spring of 2013 which ran for a minimum term ending June 30, 2014.  Without any cause or proper reason, the district prematurely ended the contract and stopped payments as of February 27, 2014.   The Board of Education belatedly paid amounts the district believed was due and owing on the contract in May 2014.  Ziegler was <u>not</u> made whole.  Additionally, absent defendants' illegal actions, Ziegler had every expectation that her contract would be renewed after the June 30, 2014 expiration of her then active contract.  To date, Ziegler has suffered financial losses for the breach of contract which will be proven in evidence in front of the jury, but which she estimates at this time to be at least $44,197 in past losses alone.  Plaintiff  Ziegler's contract is attached hereto as Ex. E and incorporated by this reference.

102.     Lana Gerber signed a contract each and every year of her employment.  Before her illegal termination, she entered into a contract in the spring of 2013 which ran for a minimum term ending June 30, 2014.  Without any cause or proper reason, the district prematurely ended the contract and stopped payments as of February 27, 2014.  The Board of Education paid

belatedly amounts the district believed was due and owing on the contract in May, 2014.  Gerber was <u>not</u> made whole.  Additionally, absent defendants' illegal actions, Gerber had every expectation that her contract would be renewed annually after the June 30, 2014 expiration of her then active contract.  To date, Gerber has suffered financial losses under the breach of contract which will be proven in evidence in front of the jury, but which she estimates at this time to be at least $46,363.22 in past losses alone.  Plaintiff  Gerber's contract is attached hereto as Ex. F and incorporated by this reference.

103.    Each plaintiff has submissible contract damages that must be determined in full by the jury, and all such past and future damages have been caused by defendants' breach of plaintiffs' respective contracts.

Wherefore, the plaintiffs' pray for judgment, after jury trial, awarding each plaintiff any and all actual damages and losses shown in evidence to be sustained by Dr. Gilhaus, Dr. Ziegler and Ms. Gerber, as determined by the jury to be fair and reasonable, for prejudgment interest, for punitive damages, for attorneys' fees, costs and expenses, and for all other damages and losses incurred herein and for such other relief as the court deems just and proper.

### COUNT V
### Breach of  Implied Contracts
### (All Plaintiffs Against Defendant USD No. 231)

104.    Plaintiffs  reallege and incorporate by reference each and every allegation of this Complaint as though fully set forth herein. Plaintiffs also incorporate herein all allegations in paragraphs that follow this Count V as though fully set forth herein.

105.    Based on established policies and practices in the district, all plaintiffs came to a mutual understanding with the district, that they would not be discharged as employees except for good and just cause had been proven.  The understanding and mutual intent of the parties

may be ascertained from many factors, which include but are not limited to: Written or oral negotiations among the plaintiffs and the district each and every year; the conduct of the parties from the commencement of the employment relationship; the usages of the business within the district and education in general; the situation and objective of the parties giving rise to the relationship.  The school district knew that all plaintiffs were working under the understanding that so long as they performed their duties satisfactorily, and absent timely and proper notice of deficiencies and an opportunity to cure, they could expect continued employment and continued renewals into the future for as long as they performed their job satisfactorily.  Other circumstances surrounding the employment relationship show that even when the specific contract terms had expired, previous practices and circumstances created implied contract rights not to be fired except for just cause being shown, relating to performance of their duties.

106.    By virtue of defendants' illegal and wrongful termination of plaintiffs' employment, each plaintiff has been damages by past and future contract loss amounts which will be proven to the jury and established after discovery.  Plaintiffs seek all past and future actual damages against defendant USD No. 231 established in evidence at trial.

Wherefore, the plaintiffs' pray for judgment, after jury trial, awarding each plaintiff any and all actual damages and losses shown in evidence to be sustained by Dr. Gilhaus, Dr. Ziegler and Ms. Gerber, as determined by the jury to be fair and reasonable, for prejudgment interest, for costs and expenses, and for all other damages and losses incurred herein and for such other relief as the court deems just and proper.

## COUNT VI
### Violations of the Kansas Wage Act
**(All Plaintiffs Against Defendant USD No. 231)**

107.    Plaintiffs  reallege and incorporate by reference each and every allegation of this Complaint as though fully set forth herein.

108.    Defendant district stopped all payment on compensation amounts owed under the plaintiffs' contracts after the illegal terminations of February 27, 2014.  Plaintiffs made immediate demands that the district reinstate the contracts retroactively, and pay all forms of compensation owed.  This did not happen, and it put financial pressure on the plaintiffs including Lana Gerber being forced to sell her home.

109.    Kansas law, specifically K.S.A. 44-313-326  required USD No. 231 to pay to plaintiffs all earned wages not later than the next regular pay day following plaintiff's termination date pursuant to K.S.A. 44-315(a).  USD No. 231 intentionally did not do so.  If an employer willfully fails to pay an employee, the employer "shall be liable to the employee for the wages due and also shall be liable to the employee for a penalty in the fixed amount of 1% of the unpaid wages for each day, except Sundays and legal holidays, upon which such failure continues after the eighth day after the day upon which payment is required or in an amount equal to 100% of the unpaid wages, whichever is less."

110.    Under the foregoing the penalty for each plaintiff "topped out" once it reaches 100% of unpaid wages.  That penalty must be paid to each of the 3 plaintiffs.

111.    Because said penalty continues to accrue on the contract amount owed to Bill Gilhaus, the penalty will equal 100% of the unpaid compensation ─ in addition to the unpaid amounts which he will seek in this lawsuit.  Plaintiff Gilhaus in unable to accurately estimate this

penalty, but reserves the right to seek recovery at trial based on the evidence presented to the jury.

Wherefore, the plaintiffs' pray for judgment against the defendant USD No. 231 for all amounts of penalties found due and owing, in addition to all unpaid wages and all forms of compensation and benefits due and owing; for costs, and for such further relief as the court deems just and proper.

## JURY DEMAND

Plaintiff hereby requests trial by jury of all issues triable by jury.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates Kansas City, Kansas as the place of trial.

Respectfully submitted,

POPHAM LAW FIRM

By: /s/ Dennis E. Egan
Dennis E. Egan    KS Bar No. 70672
712 Broadway, Suite 100
Kansas City, MO 64105
Phone:  (816) 221-2288
E-mail: degan@pophamlaw.com

**ATTORNEYS FOR PLAINTIFF**



U.S. Department of Justice
Civil Rights Division

CERTIFIED MAIL
2014 3487

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

December 15, 2014

Dr. Christy Ziegler
c/o Dennis E. Egan, Esquire
The Popham Law Firm
712 Broadway, Suite 100
Kansas City, MO  64105

Re:  EEOC Charge Against Gardner Edgerton Unified School Dist. #231
        No. 28D201400370

Dear Dr. Ziegler:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC St. Louis District Office, St Louis, MO.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Vanita Gupta
Acting Assistant Attorney General
Civil Rights Division

by Karen L. Ferguson
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: St. Louis District Office, EEOC
    Gardner Edgerton Unified School Dist. #231

**EX. A**



U.S. Department of Justice
Civil Rights Division

CERTIFIED MAIL
2014 3494

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

December 15, 2014

Ms. Lana Gerber
c/o Dennis E. Egan, Esquire
The Popham Law Firm
712 Broadway, Suite 100
Kansas City, MO  64105

Re: EEOC Charge Against Gardner Edgerton Unified School Dist. #231
    No. 28D201400376

Dear Ms. Gerber:

    Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

    If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

    The investigative file pertaining to your case is located in the EEOC St. Louis District Office, St Louis, MO.

    This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

                    Sincerely,

                    Vanita Gupta
           Acting Assistant Attorney General
              Civil Rights Division

        by

              Karen L. Ferguson
          Supervisory Civil Rights Analyst
          Employment Litigation Section

cc: St. Louis District Office, EEOC
    Gardner Edgerton Unified School Dist. #231

**EX. B**



U.S. Department of Justice
Civil Rights Division

CERTIFIED MAIL
2015 4506

*950 Pennsylvania Avenue, N.W.*
*Karen Ferguson , EMP, PHB, Room 4239*
*Washington, DC 20530*

December 04, 2014

Dr. Bill Gilhaus
c/o Dennis E. Egan, Esquire
The Popham Law Firm
712 Broadway
Suite 100
Kansas City, MO 64105

Re:  EEOC Charge Against Gardner Edgerton School District #231
     No. 563201400963

Dear Dr. Gilhaus:

Because you filed the above charge with the Equal Employment Opportunity Commission, and more than 180 days have elapsed since the date the Commission assumed jurisdiction over the charge, and no suit based thereon has been filed by this Department, and because you through your attorney have specifically requested this Notice, you are hereby notified that you have the right to institute a civil action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, et seq., against the above-named respondent.

If you choose to commence a civil action, such suit must be filed in the appropriate Court within 90 days of your receipt of this Notice.

The investigative file pertaining to your case is located in the EEOC Kansas City Area Office, Kansas City, KS.

This Notice should not be taken to mean that the Department of Justice has made a judgment as to whether or not your case is meritorious.

Sincerely,

Vanita Gupta
Acting Assistant Attorney General
Civil Rights Division

by *Karen S. Ferguson*
Karen L. Ferguson
Supervisory Civil Rights Analyst
Employment Litigation Section

cc: Kansas City Area Office, EEOC
    Gardner Edgerton School District #231

**EX. C**

Rec'd via Cert-Mail
12/11/14

# SUPERINTENDENT'S EMPLOYMENT CONTRACT

This agreement is made this ___6th___ day of __May__ , __2013__ , between the Board of Education of Unified School District No. 231, Johnson County, Kansas (hereinafter the "Board") and Bill Gilhaus (hereinafter the "Superintendent"), as ratified by a resolution adopted at the regular meeting of the Board held on the ___6th___ day of __May__ , __2013__ .

## IT IS AGREED AS FOLLOWS:

1. Employment

    The Superintendent is hereby hired and retained as the Superintendent of Schools of Unified School District No. 231, Johnson County, Kansas.

2. Term of Contract

    This contract shall be for a term of two years and ten months, commencing as of the 2nd day of September, 2013, and ending on the 30th day of June, 2016 ("the Term"). Between November 1, 2013 and March 1, 2014, the Board may offer to extend the contract for an additional one-year period to commence on July 1, 2016, which offer may be accepted by the Superintendent at any time up to and including May 31, 2014. Thereafter, the Board may, between November 1 and March 1 of any school year, offer succeeding one-year extensions of this contract, and the Superintendent shall have until May 31 following the extension of such an offer to accept it.

3. Duties

    The Superintendent shall have charge of the administration of the schools under the direction of the Board. He shall be the chief executive officer of the School District; shall direct and assign teachers and other employees of the School District; shall organize, reorganize, and arrange the administrative and supervisory staff, including instruction and business affairs, as best serves the School District; shall select all personnel, subject to the approval of the Board; shall, from time-to-time, suggest policies, regulations, rules and procedures deemed necessary for the well-ordering of the School District; and, in general, perform all duties incident to the office of Superintendent and such other duties as may be prescribed by the Board from time-to-time. The Board, individually and collectively, shall promptly refer to Superintendent all criticism, complaints, and suggestions called to its attention. Superintendent is responsible to the total Board and shall act according to majority direction from the Board. This is not to be construed to mean that individual Board members cannot request and receive timely information from the Superintendent, provided that responding to such requests does not materially impair the Superintendent's ability to perform the other functions of his job. If, in the Superintendent's judgment, the time he must take responding to such requests impairs his ability to perform the other functions of his job, he may notify the Board

1

WA4232235.1

**EX. D**

members of his concerns during an executive session. If, despite such notification, demands for information from individual Board members continue to impair the Superintendent's ability to perform the other functions of his job, the Superintendent shall notify the Board, and thereafter may use his discretion in determining which requests for information to which he should respond. Superintendent shall have the authority and responsibility to develop new programs, administrative procedures, and make other administrative changes necessary for him to carry out his duties to the extent not inconsistent with Board policy or directives of State and Federal laws.

4. <u>Compliance with Laws and Directives</u>

In the exercise of his duties and responsibilities, Superintendent agrees to comply with the laws and regulations of the United States and the State of Kansas. In addition, Superintendent agrees to comply with and enforce such policies, rules, and regulations as are from time-to-time adopted by the Board and to follow the directives of the Board.

5. <u>Goals and Objectives</u>

On or before June 30, 2013 in the first year of this Agreement, and on or before the 1st day of August each year thereafter, the parties shall meet to establish Superintendent's performance objectives for the ensuing school year. Said objectives shall be reduced to writing and shall be among the criteria by which Superintendent is evaluated as hereafter provided.

6. <u>General Administrative Operational Authority</u>

Superintendent shall have general administrative operational authority in the areas of instruction, assessments, school operations, general curriculum matters, personnel, financial and business services, and general capital improvements. Superintendent will make appropriate recommendations to the Board before action is taken with regard to significant curriculum matters, site acquisitions, new building design, debt structure, legal strategy with respect to litigation, and matters likely to have significant and widespread impact on the community or to represent significant changes in policy or practice. Recommendations for personnel appointments shall be made by the Superintendent. He shall make recommendations regarding personnel with regard to the effect on students and educational outcomes.

7. <u>Salary</u>

For the period from September 2, 2013 through June 30, 2014, the superintendent shall receive a salary of $117,723.20, paid in ten (10) substantially equal monthly installments. For the contract years beginning July 1, 2014 and July 1, 2015, the Superintendent shall receive a salary of no less than $141,267.84, payable in 12 substantially equal installments. In consideration of the salary received, the Superintendent agrees to devote the necessary time, skill, labor and attention to his

2

employment during the period of this contract, and to perform faithfully the duties of the Superintendent of Schools.  The parties agree that the salary specified herein shall be annually reviewed, and if agreed to by the parties, adjusted on or before the 30th day of June; provided, however, that in no event shall the salaries stipulated in this paragraph be reduced during the "Term of this Contract" as defined in Section 2 of this agreement, and as extended from time to time.

The parties expressly understand and agree that the salaries provided for above are based upon the assumption that, during the Term, the Superintendent will be exempt from any KPERS earnings limits applicable to retired licensed school personnel, in accordance with K.S.A. 74-4937(3).  Should that statute be repealed, or not be renewed in substantially its current form to extend past its currently-scheduled expiration date of July 1, 2015, the Superintendent's annual salary shall automatically be increased by an amount equal to the KPERS contributions that the Board is required to pay pursuant to K.S.A. 74-4937(3), as a consequence of the Superintendent returning to the Board's employ following his retirement.

8.  <u>Evaluation</u>

The Board shall annually evaluate the Superintendent according to the procedures set forth in Kansas statutes and Board policy.  The criteria upon which the Board will evaluate the Superintendent shall be determined by the Board, taking into account those criteria specified in Kansas statutes, and communicated to the Superintendent by no later than February 15th as required by Kansas statute governing Superintendent reviews.

9.  <u>Certificate</u>

The Superintendent shall furnish the Board a valid Kansas certificate to act as Superintendent of Schools, in accordance with Kansas law and Kansas Department of Education regulations.

10. <u>Benefits</u>

Except as otherwise provided below (A,B,C,D,E,F,G) the Superintendent shall be entitled to all benefits available to other full-time District employees who are not subject to a collective bargaining agreement.   In no event shall the benefits stipulated below be reduced during the "Term of this Contract" as defined in Section 2 of this agreement, and as extended from time to time.

    A.  <u>Vacation Leave</u>

The Superintendent shall be given twenty (20) days paid vacation leave annually. Without prior approval of the Board, no more than seven (7) days vacation leave may be taken at one time.  If the Superintendent does not use all of his annual paid vacation leave, he will be paid for unused vacation leave at his daily rate.  Payment for unused vacation days will be made within 60 days of the end of the contract

3

WA4232235.1

year.  In the event the Superintendent is terminated or resigns with an effective date prior to June 30 of any year in which this contract is in effect, any paid vacation leave which has not been used in that year shall be forfeited and no additional compensation shall be paid.  In the event a non-renewal of this contract for the succeeding contract period is approved by the Board, any unused vacation leave remaining on June 30 is forfeited and no additional compensation shall be paid.

### B. Sick Leave

Upon the commencement of the Term, the Superintendent shall be provided 60 days of accumulated paid sick leave, in lieu of the Board purchasing a short-term disability policy for the Superintendent's benefit.  In addition, 12 days of regular paid sick leave will be provided to the Superintendent annually.  The Superintendent shall be paid at his daily rate for each day of unused regular sick leave during the current contract year, up to 12 days.  Payment for unused regular sick leave will be made within 60 days of the end of the contract year.  The Superintendent must use each day of his regular sick leave from the current contract year before using any of his accumulated sick leave, and any accumulated sick leave days used shall be deducted from the balance provided for herein, and shall not be replenished.  In the event the Superintendent is terminated or resigns with an effective date prior to June 30 of any year in which this contract is in effect, any regular sick leave which has not been used in that year shall be forfeited and no additional compensation shall be paid.  In the event a non-renewal of this contract for the succeeding contract period is approved by the Board, any unused regular sick leave remaining on June 30 of the last year this contract is in effect is forfeited and no additional compensation shall be paid.    In no event shall the Superintendent be paid for any unused days of accumulated sick leave.

### C. Health Insurance

In addition to the annual salary provided for in Section 7, the Superintendent's annual salary shall be increased by an amount equal to the cost of family health and dental insurance premiums for the District's employees.   The Superintendent is required to enroll for individual coverage in the School District's health and dental insurance plan.  The Superintendent may waive family coverage, in which case the difference between family and individual premiums shall be taxable income to the Superintendent.    Any premiums paid shall be treated as reductions of the Superintendent's salary pursuant to the District's Section 125 cafeteria plan.

### D. Annuity

The Board shall annually make a Tax Sheltered Annuity contribution for the Superintendent's benefit in the amount of $34,000.

WA4232235.1

### E.  Automobile Allowance

The Board shall pay the Superintendent an automobile allowance of $800.00 each month during the Term of this contract, for use of his personal vehicle for school business. This compensation shall be in addition to the annual salary provided in Section 7 (Salary).    From the automobile allowance herein specified, the Superintendent will be responsible for all costs associated with the operation of such automobile, including, but not limited to, its purchase, insurance, taxes, fuel and all necessary maintenance and repair of such automobile.

### F.  Post-Termination Benefits

Following the termination of his employment from the District for any reason other than the conviction of a crime involving fraud, dishonesty or moral turpitude, the District shall make, for a period of five years from the date of termination, annual contributions to the Superintendent's 403(b) account equal to 67% of the beginning base teacher's salary, as reflected and adjusted from time to time in the District's Negotiated Agreement with its professional employees.   If the Superintendent dies before all contributions required by this subsection have been made, then any remaining amounts to be paid by the District shall be paid directly to the Superintendent's surviving spouse or such other beneficiary as the Superintendent may direct. If the Board's 403(b) Plan does not presently allow for post-termination contributions on behalf of its former employees, then the Board shall promptly amend its 403(b) Plan to permit post-termination contributions.  Regardless of the reason for the Superintendent's termination, the District shall, in accordance with and to the extent permitted by K.S.A. 12-5040, permit the Superintendent and his dependents to participate in the District's group health care benefits plan on the same terms and conditions as other retired former employees of the District whose participation rights were not determined under a collective bargaining agreement. In consideration for the Superintendent's agreement to accept employment by the Board, and forego other employment opportunities prior to the execution of this contract, these rights shall be immediately vested upon execution of this contract, and may not be divested through any action of the Board, including but not limited to a renewal of the Superintendent's contract using a form that does not include this provision, unless the Superintendent expressly agrees in writing to waive the rights vested in this section.

### G.    Mobile Phone

The District shall pay Superintendent a mobile phone allowance of $100.00 each month during the Term of this contract.   The terms and conditions of the allowance are as agreed to by the employee in the District's "Cell Phone Allowance Request Form."  From this allowance, the Superintendent shall be responsible for all costs associated with his use of a mobile phone, including the purchase of any phone, coverage for any damage or loss thereto, charges for all telephone calls and data usage, taxes, fees, and activation charges.

WA4232235.1

11. <u>Consulting or Similar Services</u>

The Superintendent shall only be permitted to perform consulting or other similar services for compensation with specific approval of the Board.

12. <u>Intellectual Property Rights</u>

The Board retains ownership of or interest in any copyright of publications or computer programs written or generated by the Superintendent in the course of performing the duties specified in this contract.

13. <u>Termination of Contract Prior to Expiration</u>

A.  This contract may be terminated by the Board if:

i.  The terms hereof are materially breached by the Superintendent;

ii.  USD 231 is deemed insolvent;

iii.  The Superintendent is incapable, due to illness, accident or other cause beyond his control, of substantially performing his duties hereunder for a period of more than six consecutive months;

iv.  The Superintendent engages in conduct which is seriously prejudicial to the operations of the District, including but not limited to neglect of duty or refusal to comply with legally valid, duly approved directives of the Board; provided, however, that before the Board terminates this contract on that basis, it shall first provide the Superintendent with written notice of the grounds for the proposed termination, and an opportunity for the Superintendent to be heard by the Board (in an executive session of the Board) as to why the Superintendent did not engage in the alleged conduct, or why this contract should not be terminated.

B.  This contract may be terminated by the Superintendent if the terms hereof are materially breached by the Board.

C.  Prior to termination by either party due to a breach of this contract, written notice of the breach shall be given to the party alleged to be in breach, and a reasonable opportunity must be afforded for the breach to be cured.

WA4232235.1

14. Notice of Renewal or Non-Renewal

During the final year of this contract (as the Term may have been extended from time to time), the Board shall give written notice to the Superintendent on or before March 1 if it is the Board's intention not to renew this contract. Failure by the Board to provide such notice within the time specified shall result in the automatic renewal of this contract for one additional year, at the same salary and with the same benefits that were provided in the final year of the contract. If the Superintendent intends to resign or retire prior to the expiration of this contract, he shall provide written notice thereof to the Board on or before December 31 of the school year in which such retirement or resignation is to become effective.

15. Indemnification

To the extent permitted by Kansas Law, the Board agrees to indemnify and hold the Superintendent harmless from any expense or liability he may incur, in his individual capacity or as an agent and employee of the School District, as the result of claims, demands, suits, actions and other legal proceedings asserted against the Superintendent and arising out of actions taken within the course and scope of his authority and employment duties. Appropriate liability insurance coverage shall be provided at School District expense for the benefit of the Superintendent. In no event will individual Board members be personally liable for indemnifying the Superintendent under the provisions of this paragraph.

16. Waiver

Any determination by the Board permitting a deviation from any of the terms of this agreement shall not be construed to be a waiver of any of the terms of this agreement, nor shall any authorization by the District for any action by the Superintendent constitute a waiver of any of the provisions of this agreement.

17. Entire Agreement

This document represents the entire agreement between the parties and the parties acknowledge that there are no other memoranda, understandings, agreements, representations or any other matter which form any part of this agreement. This agreement may only be modified in writing signed by the Superintendent or the President of the Board.


REMAINDER OF THIS PAGE INTENTIONALLY BLANK


7

WA4232235.1

_____
Superintendent

_____
President, Board of Education
Unified School District No. 231

5/7/13
_____
Date

_____
Clerk, Board of Education
Unified School District No. 231

8

WA4232235.1



Gardner Edgerton U.S.D. 231
Johnson County, Kansas
**DISTRICT ADMINISTRATOR CONTRACT**

It is hereby agreed by and between the Board of Education of Unified School District No. 231, Johnson County, State of Kansas, hereinafter called the "Board" and <u>Christina Ziegler,</u> hereinafter called the "<u>Executive Director of Educational Services.</u>"

1.  That the Executive Director of Educational Services is hereby employed by the school district for the 2013-2014 school term, for 12 calendar months beginning July 1, 2013, and ending June 30, 2014, to perform school services in conformity with Kansas law and the policies of the Board.

2.  That the Executive Director of Educational Services shall have 20 days vacation to be arranged with their supervisor. Vacation days shall be used in the school term in which they are earned and may not be accumulated.

3.  <u>Paid holidays:</u>  7-4-13, 9-2-13, 11-27-13, 11-28-13, 11-29-13, 12-23-13, 12-24-13, 12-25-13, 12-31-13, 1-1-14, and 5-26-14.

4.  <u>Sick Leave:</u>  The Executive Director of Educational Services shall be given 12 days paid sick leave annually. In the event the Executive Director of Educational Services is terminated or resigns prior to the end of any contract, any sick leave that has not been used as of the date of termination or resignation shall be forfeited and no additional compensation shall be paid. In the event of a non-renewal of this contract for a succeeding contract period, any other unused sick leave remaining on June 30th is forfeited and no additional compensation shall be paid.  Unused sick leave will be allowed to accumulate.

5.  That the Executive Director of Educational Services will perform such school services as may be assigned by the Superintendent and the Board.

6.  That the Executive Director of Educational Services will follow the written Board policies and the administrative rules and regulations set forth by the Superintendent.

7.  That the Board agrees to pay the Executive Director of Educational Services a twelve month salary of <u>$ 117,819</u>, to be paid in monthly installments through June, 2014. This contract supersedes all previous contracts.

8.  In addition to the annual salary provided for above, the Administrator's annual salary shall be increased by an amount equal to the cost of family health and dental insurance premiums for the District's employees. Enrollment in any such insurance plans offered by the School District is optional. Any salary pursuant to this section to the Administrator, and not used by the Administrator to enroll in the group health and dental plans offered by the School District, shall be taxable income to the Administrator. Any premiums paid shall be treated as reductions of the Administrator's salary pursuant to the District's Section 125 cafeteria plan.

9.  The District shall pay the Administrator a mobile phone allowance of $75.00 each month during the Term of this contract.  The terms and conditions of the allowance are as agreed to by the employee in the District's "Cell Phone Allowance Request Form".  From this allowance, the Administrator shall be responsible for all costs associated with his/her use of a mobile phone,

**EX. E**

including the purchase of any phone, coverage for any damage or loss thereto, charges for all telephone calls and data usage, taxes, fees, and activation charges.

10. <u>Entire Agreement</u>: This document represents the entire agreement between the parties and the parties acknowledge that there are no other memoranda, understandings, agreements, representations or any other matter which form any part of this agreement. This agreement may only be modified in writing signed by the Executive Director of Educational Services and the President of the Board.

This contract is recommended to the Board of Education by:

_Dr. Bill Gilhaus_____ , Superintendent

In compliance with a resolution passed by the Board at a legal meeting held on May 6, 2013, we hereunto subscribe our names this 6th day of May, 2013.

_____
Executive Director of Educational Services

_5-24-13_____
Date

_____
President, Board of Education
U.S.D. No. 231

_6/12/13_____
Date



**Gardner Edgerton U.S.D. 231**
**Johnson County, Kansas**

**DISTRICT ADMINISTRATOR CONTRACT**

It is hereby agreed by and between the Board of Education of Unified School District No. 231, Johnson County, State of Kansas, hereinafter called the "Board" and <u>Lana Gerber,</u> hereinafter called the <u>"Executive Director of Administrative Services & HR."</u>

1.  That the Executive Director of Administrative Services & HR is hereby employed by the school district for the 2013-2014 school term, for 12 calendar months beginning July 1, 2013, and ending June 30, 2014, to perform school services in conformity with Kansas law and the policies of the Board.

2.  That the Executive Director of Administrative Services & HR shall have 20 days vacation to be arranged with their supervisor. Vacation days shall be used in the school term in which they are earned and may not be accumulated.

3.  <u>Paid holidays:</u>  7-4-13, 9-2-13, 11-27-13, 11-28-13, 11-29-13, 12-23-13, 12-24-13, 12-25-13, 12-31-13, 1-1-14, and 5-26-14.

4.  <u>Sick Leave:</u>  The Executive Director of Administrative Services & HR shall be given 12 days paid sick leave annually. In the event the Executive Director of Administrative Services & HR is terminated or resigns prior to the end of any contract, any sick leave that has not been used as of the date of termination or resignation shall be forfeited and no additional compensation shall be paid. In the event of a non-renewal of this contract for a succeeding contract period, any other unused sick leave remaining on June 30th is forfeited and no additional compensation shall be paid.  Unused sick leave will be allowed to accumulate.

5.  That the Executive Director of Administrative Services & HR will perform such school services as may be assigned by the Superintendent and the Board.

6.  That the Executive Director of Administrative Services & HR will follow the written Board policies and the administrative rules and regulations set forth by the Superintendent.

7.  That the Board agrees to pay the Executive Director of Administrative Services & HR a twelve month salary of <u>$108,182,</u> to be paid in monthly installments through June, 2014. This contract supersedes all previous contracts.

8.  In addition to the annual salary provided for above, the Administrator's annual salary shall be increased by an amount equal to the cost of family health and dental insurance premiums for the District's employees. Enrollment in any such insurance plans offered by the School District is optional. Any salary pursuant to this section to the Administrator, and not used by the Administrator to enroll in the group health and dental plans offered by the School District, shall be taxable income to the Administrator. Any premiums paid shall be treated as reductions of the Administrator's salary pursuant to the District's Section 125 cafeteria plan.

9.  The District shall pay the Administrator a mobile phone allowance of $75.00 each month during the Term of this contract.  The terms and conditions of the allowance are as agreed to by the employee in the District's "Cell Phone Allowance Request Form".  From this allowance, the Administrator shall be responsible for all costs associated with his/her use of a mobile phone,

**EX. F**

including the purchase of any phone, coverage for any damage or loss thereto, charges for all telephone calls and data usage, taxes, fees, and activation charges.

10.    <u>Entire Agreement</u>:  This document represents the entire agreement between the parties and the parties acknowledge that there are no other memoranda, understandings, agreements, representations or any other matter which form any part of this agreement.  This agreement may only be modified in writing signed by Executive Director of Administrative Services & HR and the President of the Board.

This contract is recommended to the Board of Education by:

_____   ,   Superintendent

In compliance with a resolution passed by the Board at a legal meeting held on May 6, 2013, we hereunto subscribe our names this 6th day of May, 2013.

_____
Executive Director of Administrative Services & HR

_____
President, Board of Education
U.S.D. No. 231

_____5/28/13_____
Date

_____6/12/13_____
Date