## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **WILLIAM W. GILHAUS,** ) | |
| **CHRISTY ZIEGLER,** ) | |
| **LANA M. GERBER,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| **vs.** ) | **Case No. 15-2619-JAR** |
| ) | |
| ) | |
| **GARDNER EDGERTON UNIFIED SCHOOL** ) | |
| **DISTRICT NO. 231 et. al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM AND ORDER

Plaintiffs Dr. William W. Gilhaus, Dr. Christy Ziegler, and Lana M. Gerber filed this action against Defendant Gardner Edgerton Unified School District No. 231 (USD 231), and Defendants Rob Shippy, Brad Chandler, Teresa Boden, Mary Nelson, and Pam Stranathan, in their individual capacities, based on Plaintiffs' termination of employment.  Plaintiffs assert six claims: (1) violations of procedural due process rights pursuant to 42 U.S.C. § 1983 as to all defendants; (2) violations of equal protection rights pursuant to 42 U.S.C. § 1983 by Ziegler and Gerber against USD 231, Shippy, and Chandler; (3) discrimination and retaliation claims pursuant to Title VII of the Civil Rights Act of 1964 against USD 231; (4) breach of express contracts against USD 231; (5) breach of implied contracts against USD 231; and (6) violations of the Kansas Wage Payment Act against USD 231.   Before the Court is Defendants' Motion to Dismiss (Doc. 9) Plaintiffs' due process claims, breach of express contract claims, and breach of implied contract claims.  The motion is fully briefed and the Court is prepared to rule.  For the reasons stated below, the Court **grants** in part and **denies** in part Defendants' motion to dismiss.

## I.      Legal Standard

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[1]  "[T]he complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."[2]  The plausibility standard does not require a showing of probability that a defendant has acted unlawfully, but requires more than "a sheer possibility."[3]  "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim."[4]  Finally, the Court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[5]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[6]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[7]  Second, the court

---

[1] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

[2] **Error! Main Document Only.***Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[4] *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

[5] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[6] *Id.*

[7] *Id.* at 679

must determine whether the factual allegations, when assumed true, "plausibly give rise to an entitlement to relief."[8]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[9]

## II.     Factual Allegations

Drawing all reasonable inferences in favor of Plaintiffs, the following facts are taken from the Complaint.[10]

Plaintiffs are former administrative employees of USD 231.  Plaintiff Dr. William Gilhaus began as superintendent of USD 231 in 2004.   Plaintiff Dr. Christy Ziegler was hired by USD 231 in 2005, and her title at the time of her termination was Executive Director of Educational Services.  Plaintiff Lana Gerber was hired by USD 231 in 2004, and her title at the time of her termination was Executive Director of Administrative Services.  Ziegler and Gerber each had one-year contracts with USD 231, which were renewed each year until their terminations on February 27, 2014.  At the time of their terminations, both Ziegler and Gerber's contracts provided for employment terms of July 1, 2013 to June 30, 2014.

Gilhaus also had a contract with USD 231, which he had negotiated prior to his planned retirement in May 2013.  Gilhaus' extended contract, entered into on May 6, 2013, provided for a term of appointment as superintendent for two years and 10 months.  The contract also provided that the Board could offer to extend the contract by one year between November 1, 2013 and March 1, 2014, and that the contract would be automatically extended by one year if the Board

---

[8] *Id.*

[9] *Id.* at 678.

[10] *Id.*

did not notify Gilhaus of its decision not to renew by March 1, 2016.[11]  Additionally, Gilhaus'

contract contained a "Post-Termination Benefits" clause, which provided that

> the District shall make, for a period of five years from the date of termination,
> annual contributions to the Superintendent's 403(b) account equal to 67% of the
> beginning base teacher's salary.[12]

The contract further provided that Gilhaus' employment could be terminated if:

(i)     The terms hereof are materially breached by the Superintendent;
(ii)    USD 231 is deemed insolvent;
(iii)   The Superintendent is incapable, due to illness, accident or other cause
        beyond his control, to substantially perform his duties hereunder for a
        period of more than 6 consecutive months;
(iv)    The Superintendent engages in conduct which is seriously prejudicial to
        the operations of the District . . . ; provided, however, that before the
        Board terminates this contract on that basis, it shall first provide the
        Superintendent with written notice of the grounds for the proposed
        termination, and an opportunity for the Superintendent to be heard by the
        Board (in an Executive Session of the Board) as to why the Superintendent
        did not engage in the alleged conduct, or why this contract should not be
        terminated.[13]

Finally, the contract provided that prior to termination of the contract by either Gilhaus or

the Board of Education ("the Board") for breach of the agreement, each party would be entitled

to notice and an opportunity to cure the breach.[14]

Defendants Rob Shippy and Brad Chandler were elected to the Board in April 2013.

Defendants Mary Nelson and Tresa Boden were appointed to the Board in September 2013 after

resignations by other Board members.  At the time of Plaintiffs' terminations, Defendant Pam

Stranathan was serving in an administrative role under the supervision of Ziegler and Gerber.

---

[11] Doc. 1, Ex. D.

[12] *Id.*

[13] Doc. 1 at 7–8.

[14] *Id.* at 8.

Beginning in the Spring of 2013, Ziegler and Gerber began experiencing unwelcome sexually charged conduct from Shippy and Chandler.  Shippy made "leering stares" directed toward Gerber at a finance meeting on July 22, 2013, and questioned the salary of administrators.  At the same meeting, Chandler commented on Gerber's skirt, how she dressed, and "how he liked how [she] looked."  After Shippy made public statements that the administration was "reckless and irresponsible," Gerber requested a meeting with him to explain staffing decisions.  At the meeting on August 6, 2013, which Ziegler also attended, Shippy interrupted Gerber by stating, "I know more than you."  During this meeting Shippy stared "up and down" at Gerber and Ziegler, referred to them as "ladies," and made the following comment to Gerber: "Sweetie, I have been in this district long before you, and I will be in it long after you are gone."  Ziegler learned from colleagues that Shippy did not use the same tone with male employees of the district.

Gerber attended a January 28, 2014 Planning Committee Meeting, which Chandler and outside contractors also attended.  While Gerber was discussing updates to tennis courts in the district and talking about a tennis equipment shed in front of the group, Chandler interrupted her by asking, "Don't you think we should call it the love shack?"  Chandler repeated this comment three times.  At a February 10, 2014 Executive Session Board meeting that Gerber attended, Gerber chose a seat and Chandler came over to sit next to her.  Gerber commented to Chandler something to the effect of "Looks like you have to sit next to me; you must have drawn the short straw."  Chandler responded by stating "How do you know I have a short straw? I take personal offense to that," and laughed.  Shippy, hearing this comment, also began laughing.

In early February 2014, Gerber and Ziegler twice reported their concerns about Shippy and Chandler to Superintendent Gilhaus.  On Febraury 13, 2014, during Gilhaus' evaluation

meeting, Gilhaus reported the concerns to Board President Mark Grannell and Vice President James Repshire.[15]  Gilhaus also notified Board counsel Joe Hatley and the rest of the Board of the charges.  Hatley immediately initiated steps necessary for an internal investigation of the charges pursuant to Board practices and procedures.  Ziegler and Gerber filed separate formal complaints on February 26, 2014, and Hatley forwarded the complaints to all Board members.[16]

On the morning of February 27, 2014, Shippy posted a message on Facebook that the Board would conduct a "special" meeting.  The message stated: "Meeting this evening will be exciting.  Special meeting called by 3 BOE members, Boden, Shippy, Nelson at 6:00 p.m."  When one recipient of the message asked what the excitement would be, Shippy replied "All about special people.  It should be worth attending."  Gerber and Ziegler were specifically told not to attend the meeting, and the meeting agenda disclosed nothing that would require their attendance.  Thus, Gerber and Ziegler did not attend.

Three of the seven Board members and Board counsel Hatley did not know of the reason for the meeting.  For that reason, Hatley challenged the legality of the meeting when it began.  Hatley stated several times that, in his opinion, this was "not a legal meeting," and that the topic for discussion had not been properly and timely identified for all members of the Board.  Shippy stated to Hatley, "Shut up, you work for me, I'm tired of your opinions."  Hatley responded, "Mr. Shippy, this is not my opinion, it is Kansas statute law, and I'm trying to keep you from getting your butt sued off."

After public debate, the Board held an Executive Session for one and one-half hours.  After returning from the Executive Session, the Board immediately voted to terminate the

---

[15] *Id.* at 12.

[16] *Id.*

employment of Gilhaus, Ziegler, and Gerber.[17]   The vote was 4-3 in favor of termination, and the "yes" votes consisted of Defendants Shippy, Chandler, Nelson, and Boden.[18]   Immediately after the vote to terminate, Defendant Pam Stranathan was named Interim Superintendent.  Stranathan had been told before the meeting about the proposed terminations, and had agreed to be ready to "step in" as superintendent upon Gilhaus' termination.

During the Executive Session, the Board received notice from Donna Whitehead, Executive Director of Legal Services for the Kansas Association of School Boards, that the proposed termination actions were not legal.  Whitehead stated that she "strongly advised against the planned firings," and that "you will be placing yourselves and the District in a position of liability, with a likely lawsuit following."

After the meeting, the Board sent President Grannell, Vice President Repshire, and Board counsel Hatley to inform Gilhaus of the termination decision.  When Gilhaus asked for the reason given for the terminations, the response was "there was none."[19]   Gilhaus then commented that the terminations had occurred without due process.  The three spokespersons stated collectively, "they don't care."  Gerber and Ziegler were given the same message.  All three employees were told that the Board would be advised that there was "no legal reason" to withhold paying out the remainder of their contracts.

After the Board meeting, Shippy was filmed outside his home by a local news station stating that there was "just cause" for the terminations.[20]   At a later Board meeting, a citizen challenged the Board for the terminations during a public comment portion of the meeting.

---

[17] *Id.* at 14.

[18] *Id.*

[19] *Id.* at 15.

[20] *Id.* at 16.

Chandler responded that "I'd like to add, you forgot a couple of things about including the divide that he [Bill Gilhaus] drove into many people around here and many staff that we lost because of him."[21]  Plaintiffs allege Chandler's statement was false.

Following periods of unemployment, Gerber and Ziegler obtained reemployment as educators at lower rates of pay and lower seniority levels.  During her search for reemployment, Gerber found that people who had agreed to write her letters of recommendation reversed themselves based on directives from the District.  Gerber also learned from her future school of employment that the school had received complaints from parents who were concerned that the school "hired a person who was publically terminated in mid-year in an area district."  Gilhaus is unable to find comparable employment.  Plaintiffs allege that in the education community, it is widely understood that mid-year terminations are reserved for the most serious offenses, such as improper sexual behavior or committing a crime involving dishonesty or moral turpitude.[22]

## III.   Discussion

### A.  Count I—Procedural Due Process Claim Under 42 U.S.C. § 1983

Plaintiffs' Complaint asserts claims for deprivations of their procedural due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."[23]  To succeed on a procedural due process claim, an individual must prove two elements: first, that she possessed a constitutionally protected liberty or property

---

[21] *Id.* at 17.

[22] *Id.* at 15–16.

[23] *Scothorn v. Kansas*, 772 F. Supp. 556, 560 (D. Kan. 1991).

interest such that the due process protections were applicable, and second, that she was not "afforded an appropriate level of process."[24]

Plaintiffs claim they had protected property interests in continued employment based on their employment contracts, and that they had protected liberty interests in the right to be free from stigmatization from their employer.  Plaintiffs allege that the termination proceedings did not afford them with an appropriate level of process.  Defendants do not dispute Plaintiffs' claim that they did not receive due process before termination.  Instead, they seek to dismiss parts of Count I because (1) Bill Gilhaus lacked a property interest; (2) all Plaintiffs lacked a liberty interest; (3) the individual Defendants are entitled to qualified immunity on both the property and liberty interest claims; and (4) Plaintiffs failed to state due process claims against Defendant Pam Stranathan.

### 1.   Bill Gilhaus' Property Interest

"An individual has a property interest in a benefit for purposes of due process protection only if he has a 'legitimate claim of entitlement' to the benefit, as opposed to a mere 'abstract need or desire' or 'unilateral expectation.'"[25]  The existence of such an entitlement is generally defined by state law, while federal law "determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause."[26]  "State law sources for property interests can include statutes, municipal charters or ordinances, and express or implied

---

[24] *Copelin-Brown v. N.M. State Pers. Office*, 399 F.3d 1248, 1254 (10th Cir. 2005) (internal quotation omitted).

[25] *Teigen v. Renfrow*, 511 F.3d 1072, 1078–79 (10th Cir. 2007) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

[26] *Roth*, 408 U.S. at 577; *Teigen*, 511 F.3d at 1079.

contracts."[27]  Therefore, the Court must look to Kansas law to determine whether Gilhaus held a protected property interest in continued employment.

Gilhaus contends that his property interest stems from "clearly established law" that he would not be discharged without due process and from his negotiated contract with the school board.  Defendants counter that Gilhaus' employment contract is *ultra vires*, and therefore does not give rise to a property interest in continued employment.  Kansas courts have held that an *ultra vires* contract does not give rise to a protected property interest.[28]  A contract is *ultra vires* if there is no power to enter into it.[29]

Before addressing Defendants' arguments concerning Gilhaus' contract, the Court notes that Kansas statutory law does not provide Gilhaus with a property interest in continued employment.  The Kansas Teachers' Due process Act provides due process rights to teachers before termination, and the Kansas Administrator Act provides the same rights to administrators.[30]  However, both laws expressly exclude superintendents from their reach.[31]  Therefore, to the extent Gilhaus has a protected property interest, this interest must arise from his employment contract.

---

[27] *Schulz v. City of Longmont, Colo.*, 465 F.3d 433, 444 (10th Cir. 2006) (citing *Kingsford v. Salt Lake City Sch. Dist.*, 247 F.3d 1123, 1128 (10th Cir. 2001)).

[28] *Miller v. Board of Educ., Unified Sch. Dist. No. 470, Cowley Cnty.*, 744 P.2d 865, 869 (Kan. Ct. App. 1987); *see also Wiggins v. Housing Auth. of Kan. City*, 916 P.2d 718, 722–23 (Kan. Ct. App. 1996) (holding that public employee had no protected property interest in continued employment because Housing Authority had no power to enter into contract).

[29] *Genesis Health Club, Inc. v. City of Wichita*, 181 P.3d 549, 563–64 (Kan. 2008) ("If a municipal corporation enters into a contract it has no power to make, it is ultra vires and unenforceable").

[30] K.S.A. § 72-5437 (applying Due Process rights to teachers); K.S.A. § 72-5452 (applying Due Process rights to administrators).

[31] K.S.A. § 72-5437(c)(3)(B) ("The term 'teacher' does not include any supervisors, principals or superintendents"); K.S.A. § 72-5451(b) ("The term administrator shall not mean or include a superintendent of schools.").

Defendants first contend that Gilhaus' contract is *ultra vires* because the appointment term exceeds the limitation in K.S.A. § 72-8202b(a) that a board of education "shall appoint a superintendent of schools for a term of not more than three (3) years."[32]  Gilhaus' contract provides for an appointment of two years and 10 months.  Defendants maintain, however, that the post-termination benefits clause, which provides for payment of benefits to Gilhaus for five years after the expiration of his term, extends Gilhaus' appointment term to seven years and 10 months.  The Court is not convinced that the post-termination benefits clause operates to extend Gilhaus' employment beyond the limitations of K.S.A. § 72-8202(b).  There is no indication that Gilhaus would continue to serve as superintendent while receiving the post-termination benefits.  On the contrary, the term "post-termination benefits" indicates that Gilhaus would receive these benefits after his appointment term expired.  Therefore, the Court finds the contract does not violate K.S.A. § 72-8202(b).

Defendants also argue that Gilhaus' contract is *ultra vires* because it attempts to bind subsequent Boards of Education.  A legislative body cannot bind its successor to the amendment or repeal of its laws.[33]  Under Kansas law, "a board of education is a legislative body within its proper scope and functions."[34]  Defendants contend that several clauses within the contract bind successive boards of education.  Defendants point to language in the contract that allows the Board to renew Gilhaus' contract within the first year of his term, and to language that automatically renews Gilhaus' contract if the Board does not provide notice of non-renewal by a certain date within the last year of his term.  Defendants argue that this language binds future

---

[32] K.S.A. § 72-8202b(a).

[33] *Red Dog Saloon v. Sedgwick Cnty. Bd. of Comm'rs*, 33 P.3d 869, 871 (Kan. Ct. App. 2001) (citing *Taneyhill v. Kansas City*, 3 P.2d 645 (Kan. 1931)).

[34] *Andeel v. Woods*, 258 P.2d 285, 288 (Kan. 1953).

boards to continue Gilhaus' employment.  However, the effect of this language is to provide an option to later boards to continue Gilhaus' employment, rather than to bind future boards to such an extension.  Defendants also maintain that contract language that sets Gilhaus' compensation and provides that his salary will not be reduced during the appointment term binds future boards.[35]  These compensation clauses, however, are within the Board's authority to set the superintendent's compensation.[36]  Therefore, Gilhaus' contract is not *ultra vires* on the basis that it binds future Boards.

Finally, Defendants argue that the contract is *ultra vires* because the post-termination benefits clause violates Kansas' Cash Basis Law.  The Cash Basis Law requires "all municipalities" to "pay or refinance their valid indebtedness as provided in the cash-basis law, in the manner and at the times herein set forth, and to contract no indebtedness."[37]  School districts are included in the definition of "municipality" under the Law.[38]  The Law also states that "[t]he limits of indebtedness . . . may be exceeded when . . . the indebtedness is created by a municipality in establishing a post-employments benefits trust fund in accordance with K.S.A. § 12-16, 102."[39]  K.S.A. § 12-16, 102 in turn provides that "any taxing subdivision may create and establish employee benefits contribution funds," but the statute excludes school districts from the definition of "taxing subdivision."[40]  Defendants assert that these statutes, read together, expressly exclude the Board from providing Gilhaus with post-termination benefits.

---

[35] Doc. 10 at 11–12.

[36] K.S.A. § 72-8202b(a).

[37] K.S.A. § 10-1102(b).

[38] K.S.A. § 10-1110(a).

[39] K.S.A. § 10-1116(a).

[40] K.S.A. § 12-16,102.

The Court is not convinced that the statutes clearly prevent the Board from including post-termination benefits in Gilhaus' contract.  The purpose of the Cash Basis Law is not to prevent municipalities from providing post-employment benefits, but to prevent municipalities from spending money they do not have.[41]  To the extent the Board could meet its financial obligations to Gilhaus without incurring indebtedness, the Cash Basis Law would not appear to prevent the Board from including post-termination benefits as a form of compensation to Gilhaus.[42]

Assuming that the post-employment benefits clause exceeded the Board's authority, Gilhaus' contract still provides him with a protected property interest under Kansas law. Defendants rely on the Tenth Circuit case *N.L.R.B. v. Tulsa Sheet Metal Works, Inc.*[43] to argue that because Gilhaus' contract does not contain a severability clause, the post-termination benefits clause cannot be separated from the rest of the contract.  However, *Tulsa Sheet Metal* simply recognizes the effect of a severability clause, rather than requiring such a clause in order for a court to separate an illegal clause that does not permeate the rest of the contract.[44]  Under Kansas law, an illegal contract provision that is easily severable from the rest of the contract will not void the entire contract, despite the absence of a severability clause.[45]  Here, the post-

---

[41] *Unified Sch. Dist. No. 207 v. Northland Nat'l Bank*, 887 P.2d 1138, 1142 (Kan. Ct. App. 1994) (quoting *State, ex rel., v. Bd. of Educ.*, 21 P.2d 295 (Kan. 1933)).

[42] K.S.A. § 72-8202b(a) (providing that superintendents "shall receive compensation fixed by the board").

[43] 367 F.2d 55, 59 (10th Cir. 1966).

[44] *Id.* (severing an illegal contract clause based on a severability provision and because the illegal clause did not "permeate the complete contract to such an extent as to affect its enforceability entirely").

[45] *Miller v. Foulston, Siefkin, Powers & Eberhardt*, 790 P.2d 404, 413 (Kan. 1990) (holding that even without a severability clause, "a contract that contains valid and invalid provisions in which the lawful provisions can be easily severed will be upheld as to the lawful portion"); *see also Petty v. City of El Dorado*, 19 P.3d 167, 172 (Kan. 2001) ("it is the duty of the courts to sustain the legality of contracts in whole or in part when possible"); *Wolfgang v. Mid-Am. Motorsports, Inc.*, 898 F. Supp. 783, 788 (D. Kan. 1995) (recognizing that under Kansas law,

termination benefits clause is easily severable from the rest of the contract.  The post-termination benefits clause does not affect the portions of the contract that provide Gilhaus with due process rights before termination, or the clause that provides for Gilhaus' term of appointment.  The arguably illegal benefits clause does not strip all power from the Board to enter into the contract, thereby making it *ultra vires*.  Therefore, the Court finds that Gilhaus has plausibly alleged a protectable property interest based on termination of his contract.

### 2. Plaintiffs' Liberty Interest

A public employee's "liberty interest may be impinged if the Government 'imposed on him a stigma or disability that foreclosed his freedom to take advantage of other employment opportunities.'"[46]  In *Melton v. City of Oklahoma City*,[47] the Tenth Circuit stated that a liberty interest claim may arise

> [w]hen a public employer takes action to terminate an employee based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage the employee's standing or associations in the community and foreclose the employee's freedom to take advantage of future employment opportunities.[48]

Subsequent cases have distilled this statement into a four-part test that plaintiffs must meet to state a claim for deprivation of a due process liberty interest:

> First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee.  Second, the statements must be false.  Third, the statements must occur in the course of terminating the employee or must

---

"any term in a contract which attempts to exempt a party from liability for gross negligence or wanton conduct is unenforceable, not the entire agreement") (internal quotations omitted).

[46] *Sipes v. United States*, 744 F.2d 1418, 1422 (10th Cir. 1984) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).

[47] 928 F.2d 920 (10th Cir. 1991).

[48] *Id.* at 926–27.

foreclose other employment opportunities.  And fourth, the statements must be published.[49]

Plaintiffs bring liberty interest claims against all defendants based on their termination in the middle of the school year.  Plaintiffs maintain that "such actions stigmatized the plaintiffs so as to seriously damage their standings and associations in the community, or foreclosed freedom to take advantage of other employment opportunities."  Plaintiffs also point to the statements by Defendants Shippy and Chandler concerning "just cause" for the terminations and the "divide [Gilhaus] drove" between district staff.

Defendants argue that Plaintiffs fail to state liberty interest claims for several reasons.  First, Defendants contend that the claims against Boden, Nelson and Stranathan must fail under the first prong of the test because these Defendants made no statements against the Plaintiffs.  Second, Defendants contend that the statements by Shippy and Chandler do not "impugn the good name, reputation, honor, or integrity" of Plaintiffs.  Third, Defendants argue that the statements did not foreclose other employment opportunities for Plaintiffs Gerber and Zeigler, as they have both been reemployed.  Finally, Defendants maintain that Chandler was entitled to legislative immunity for the statements he made at the post-termination Board meeting.

The Court agrees that Plaintiffs have failed to state liberty interest claims against Defendants Boden, Nelson and Stranathan.  Plaintiffs do not refer to specific statements made by these Defendants, but instead allege that their actions, i.e. voting to terminate Plaintiffs' employment, were stigmatizing.  Plaintiffs contend that the vote to terminate employment was stigmatizing because it occurred in the middle of the school year, and in the education field it is well understood that mid-year termination is reserved for the most serious offenses, such as

---

[49] *Workman v. Jordan*, 32 F.3d 475, 481 (10th Cir. 1994); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 526 (10th Cir. 1998).

improper sexual behavior or committing a crime involving dishonesty or moral turpitude.[50]

Regardless of the stigmatizing effect of the vote to terminate mid-year, such action does not meet

the test for stigmatization.  The Tenth Circuit test for liberty interest claims requires stigmatizing

*statements*, and does not appear to recognize stigmatizing *actions*.[51]  Therefore, the Court

dismisses the liberty interest claims against Boden, Nelson and Stranathan.

Defendants also seek dismissal of the claims against Shippy and Chandler, arguing that

their statements were not stigmatizing.   Under the Tenth Circuit test for liberty interest claims,

"the statements must impugn the good name, reputation, honor, or integrity of the employee," or

must be stigmatizing.[52]   To be stigmatizing, the statements must carry a high level of stigma that

implicates the employee's dishonesty or immorality.[53]  In *Melton*, the court further elaborated on

the distinction between stigmatizing and non-stigmatizing statements.[54]  The court stated:

> Charges are not stigmatizing enough to rise to a constitutionally protected liberty
> interest unless they involve allegations of dishonesty, immorality, or
> unprofessional or illegal conduct of the type that would be expected to seriously
> diminish employment opportunities. Charges of poor job performance,
> negligence, tardiness, or even insubordination, would not rise to the level of a
> violation of a protected liberty interest.[55]

---

[50] Doc. 1 at 15–16.

[51] *Workman*, 32 F.3d at 481; *Tonkovich*, 159 F.3d at 526; *see also Darr v. Town of Telluride*, 495 F.3d 1243, 1255 (10th Cir. 2007) (dismissing liberty interest claim because plaintiff could not assert that defendant made stigmatizing statements about him during termination process).

[52] *Workman*, 32 F.3d at 481; *Melton*, 928 F.2d at 926.

[53] *Melton*, 928 F.2d at 932; *Jones v. City of Topeka*, 764 F. Supp. 1423, 1431–32 (D. Kan. 1991).

[54] *Melton*, 928 F.2d at 933.

[55] *Id.*; *see Brammer-Hoelter v. Twin Peaks Charter Acad.*, 81 F. Supp. 2d 1090, 1095 (D. Colo. 2000) (finding allegation that employee was fired for "just cause" not stigmatizing).

Whether a statement is stigmatizing is a question for the court.[56]  The statements by Chandler concerning the divide Gilhaus created and the staff lost because of him do not rise to the level of stigmatizing under this standard.  Chandler's statements imply problems with Gilhaus' management style, but they do not raise allegations of dishonesty, immorality, or unprofessional or illegal conduct.  Further, the Court finds that Shippy's "just cause" statement does not stigmatize Plaintiffs under the standard set forth above.  Given the context of the mid-year terminations, the statement that Plaintiffs were terminated for "just cause" could possibly raise questions about whether they were engaged in dishonest, immoral, unprofessional or illegal conduct.  But this possibility is not enough to meet the "high level stigma" standard under *Melton*.[57]  To be stigmatizing, the statements must involve affirmative accusations of dishonest, immoral, unprofessional or illegal conduct.[58]  Shippy's statement simply leaves to interpretation the type of conduct Plaintiffs engaged in.  Therefore, the liberty interest claims against Chandler and Shippy must be dismissed.[59]

### 3.  Qualified Immunity

In Section 1983 damages suits, the individual offending party may be entitled to qualified immunity from damages liability under certain circumstances.[60]  "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open

---

[56] *Palmer v. City of Monticello*, 31 F.3d 1499, 1503 n.2 (10th Cir. 1994); *Warren v. City of Junction City, Kan.*, 176 F. Supp. 2d 1118, 1132 (D. Kan. 2001).

[57] *Melton*, 928 F.2d at 932.

[58] *Id.* at 933; *Palmer*, 31 F.3d 1499, 1503 (explaining that to be stigmatizing, statements must involve "charges of dishonesty or immorality"); *Warren*, 176 F. Supp. 2d at 1132–33 ("A statement is stigmatizing if it involves accusations of dishonesty or immorality.").

[59] Because the Court has found that the statements were not stigmatizing, the Court does not address Defendants' arguments that Gerber and Zeigler did not have their employment foreclosed by the statements and that Chandler was entitled to legislative immunity.

[60] *Gomez v. Toledo*, 446 U.S. 635, 639 (1980).

legal questions."[61]  To this end, qualified immunity shields government officials from liability

for money damages unless the plaintiff shows (1) the defendant's violation of a constitutional

right; and (2) that the right the official violated was "clearly established" at the time of the

challenged conduct.[62]  Accordingly, the qualified immunity defense must be resolved "at the

earliest possible stage of litigation."[63]  For the court to resolve the issue of qualified immunity at

the earliest possible stage of litigation, the complaint must allege enough facts to make clear the

grounds on which the claim rests.[64]

Courts have discretion to decide which of the two prongs of the analysis to address first.[65]

Defendants assert that they are entitled to qualified immunity as to Gilhaus' property interest

claim and as to all Plaintiffs' liberty interest claims.  The Court has determined above that

Gilhaus has stated a claim for deprivation of his due process property interest rights.

Additionally, the Court has determined that Plaintiffs have failed to state a claim for deprivation

of their due process liberty interest rights.  Therefore, the Court must address whether Gilhaus'

property interest rights were "clearly established" at the time of the vote to terminate his

contract.[66]

A government official violates clearly established law when the contours of a right at the

time of the challenged conduct are sufficiently clear so that "every 'reasonable official would

---

[61] *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011).

[62] *Id.* at 2080.

[63] *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

[64] *Id.* (citing *Twombly,* 550 U.S. at 556 n.3).

[65] *al-Kidd*, 131 S. Ct. at 2080 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

[66] Defendants do not move as to Plaintiffs Zeigler and Gerber's property interest claims.  Nor do Defendants assert qualified immunity as to these claims.  Thus, the Court's qualified immunity analysis is limited to Gilhaus' property interest claim.

have understood that what he is doing violates that right.'"[67]  When the clearly established requirement is "properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'"[68]  "[T]he Supreme Court has 'shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional.'"[69]

Before determining whether the right at issue here was clearly established, the Court must first define the right.  The United States Supreme Court has repeatedly warned courts not to define a right too broadly for purposes of the clearly established analysis.[70]  Most recently, the Supreme Court, in *Ashcroft v. al-Kidd*, explained that if the right is defined at a high level of generality, it "is of little help in determining whether the violative nature of particular conduct is clearly established."[71]  The rights at issue in this case are Gilhaus' property interest right to continued employment during the term of his appointment, as well as his right to notice and an opportunity to be heard before termination during this term.  By terminating Gilhaus mid-term without providing him due process, the Board violated these rights.

Defendants argue that these rights were not clearly established because Gilhaus' contract, the source of the rights, was *ultra vires*.  The Court has found, however, that even if the post-

---

[67] *Id.* at 2083.

[68] *Id.* at 2085 (citing *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[69] *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (quoting *Pierce v. Gilchrist,* 359 F.3d 1279, 1298 (10th Cir.2004)).

[70] *Id.* at 2084 (citing *Brosseau v. Haugen,* 543 U.S. 194, 198–99 (2004); *Wilson v. Layne,* 526 U.S. 603, 615 (1999); *Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987); *Sawyer v. Smith,* 497 U.S. 227, 236 (1990)).

[71] *al-Kidd*, 131 S. Ct. at 2084.

termination benefits clause was *ultra vires*, this would not void the entire contract.  Defendants do not allege that at the time of Gilhaus' termination they had any reason to doubt the enforceability of Gilhaus' contract.  To the contrary, Plaintiffs' Complaint alleges that the Board members gave no reason for withholding due process, that the Board was told by counsel that there was "no legal reason" to withhold paying out the remainder of Plaintiffs' contracts, that counsel informed the Board that termination of Plaintiffs without due process would be illegal, and that the Board had expressed that they did not care that there was no legal reason for the terminations without due process.  These allegations, which the Court must accept as true for purposes of ruling on Defendants' Motion to Dismiss,[72] suggest that Defendants fully believed that Gilhaus' contract was enforceable when they voted to terminate him, but decided to disregard it.  Under these circumstances, any reasonable official would have understood that voting to terminate Gilhaus without due process would violate his constitutionally protected property interest in continued employment.  Accordingly, the Court finds that Defendants are not entitled to qualified immunity with respect to Gilhaus' due process property interest claim.

### 4.  Due Process Claims against Pam Stranathan

Defendants also seek to dismiss the due process claim against Defendant Pam Stranathan, arguing that Stranathan did not act under color of state law to deprive Plaintiffs of their constitutional rights, as required to state a claim for relief under § 1983.[73]  "Liability under § 1983 requires personal participation in the unlawful acts," but "personal involvement does not require direct participation."[74]  Indeed, § 1983 liability can be premised on a theory of

---

[72] *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556).

[73] *Beedle v. Wilson*, 422 F.3d 1059, 1064–65 (10th Cir. 2005).

[74] *Id.* at 1072; *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010).

conspiracy.[75]  To state a claim for relief based on a § 1983 conspiracy theory, a plaintiff must prove the existence of an agreement and concerted action among the co-conspirators to deprive the plaintiff of her constitutional rights.[76]  Such an agreement often must be proven by circumstantial evidence because of the lack of an express agreement among conspirators.[77] Additionally, "proof of an agreement to deprive often will require examination of conduct occurring prior to the deprivation."[78]  In *Snell v. Tunnell*, the Tenth Circuit further discussed the proof requirements for conspiracy liability under § 1983:

> A plaintiff seeking redress need not prove that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all the participants therein. An express agreement among all the conspirators is not a necessary element of a civil conspiracy.  The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for desiring the intended conspiratorial result.  To demonstrate the existence of a conspiratorial agreement it simply must be shown that there was a single plan, the essential nature and scope of which was know[n] to each person who is to be held responsible for its consequences.[79]

Here, Plaintiffs' due process claim against Stranathan is premised on a conspiracy theory under § 1983.[80]  Plaintiffs allege that before the meeting to terminate Plaintiffs, "Stranathan was informed of the secret but intentional plan to vote to prematurely end the employment of

---

[75] Tonkovich, 159 F.3d at 533; *Snell v. Tunnell*, 920 F.2d 673, 701–02 (10th Cir. 1990); *Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990).

[76] *Tonkovich*, 159 F.3d at 533 (holding to state a valid § 1983 conspiracy claim, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants"); *Dixon*, 898 F.2d at 1449 (holding to establish § 1983 conspiracy claim, a plaintiff must prove an agreement and an actual deprivation of a constitutional right); *Snell*, 920 F.2d at 701.

[77] *Snell*, 920 F.2d at 701–02.

[78] *Id.*

[79] *Id.* (citing *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754 (1980)).

[80] Doc. 1 at 21 ("Defendant Pam Stranathan is liable in her individual capacity, because she conspired with the school district and the other individual defendants to be ready to 'step in' as Interim Superintendent, and she agreed to do so with full knowledge of the impending public terminations.").

Gilhaus, Ziegler and Gerber."[81]  Further, Plaintiffs allege that Stranathan agreed to "step in" as superintendent after learning of this plan.[82]  Defendants seek dismissal because "[t]he complaint does not allege that Stranathan exerted influence over the BOE or the other individual defendants, does not allege that her judgment was substituted for that of the BOE, or that she even participated in the decision by the BOE."[83]  Thus, Defendants contend, Stranathan did not act under color of state law to deprive Plaintiffs' constitutional rights.

The Court agrees that the due process claims against Stranathan must be dismissed. Although Stranathan knew of the plan to terminate Plaintiffs without due process, she was not a "person who [was] to be held responsible for its consequences."[84]  Stranathan was not a member of the Board, and thus she did not have the power to terminate or to act in concert to terminate Plaintiffs' employment.  Stranathan may have reaped the rewards of Plaintiffs' early termination, but she could not have conspired to deprive Plaintiffs' property interests in continued employment because she had no power to do so.  Therefore, the Court dismisses Plaintiffs' due process claims against Stranathan.

Based on the findings above, Plaintiffs' Count I property interest claims against Defendants USD 231, Shippy, Chandler, Boden, and Nelson remain before the Court. Defendants are not entitled to qualified immunity on Plaintiffs' property interest claims. Plaintiffs' Count I liberty interest claims are dismissed.  Additionally, all Count I claims against Defendant Stranathan are dismissed.

### B.  Count IV—Breach of Express Contract

---

[81] *Id.* at 12.

[82] *Id.* at 21.

[83] Doc. 10 at 15.

[84] *Snell*, 920 F.2d at 701–02

Defendants also seek to dismiss Gilhaus' breach of express contract claim, arguing that it is void.  Defendants do not point to particular provisions of Gilhaus' contract that make it void.  However, to the extent Defendants rely on the same provisions that they argue make the contract *ultra vires*, the Court has found these provisions either enforceable or easily severable from the remainder of the contract.  Therefore, Defendants' Motion to Dismiss Count IV is denied.

### C.  Count V—Breach of Implied Contract

Under Kansas law, an implied employment contract arises in which an employer cannot terminate an employee arbitrarily when a policy or program of the employer, either express or implied, restricts the employer's right of termination at will.[85]  In *Morriss v. Coleman Co.*,[86] the Kansas Supreme Court directed courts to examine the following factors in determining the existence of an implied contract:

> written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.[87]

Whether an implied contract exists to prevent arbitrary termination of employment is normally a question of fact for the jury.[88]

Plaintiffs claim they had implied contract rights to continued employment, or to not be non-renewed without notice and good cause.  They allege that these implied rights were based on

---

[85] *Allsup v. Mount Carmel Med. Ctr.*, 922 P.2d 1097, 1100 (Kan. Ct. App. 1996) (quoting *Brown v. United Methodist Homes for the Aged*, 815 P.2d 72 (Kan. 1991)).

[86] 738 P.2d 841 (Kan. 1987).

[87] *Id.* at 848–89 (quoting *Allegri v. Providence-St. Margaret Health Ctr.*, 684 P.2d 1031 (Kan. Ct. App. 1984)).

[88] *Id.* at 848; *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 537 (10th Cir. 1995).

written and oral negotiations with Defendant, the Board's knowledge that Plaintiffs were

working with the understanding that so long as they performed their duties satisfactorily they

could expect continued employment, and previous practices by the Board in renewing Plaintiffs'

contracts.  Defendants respond that any implied contract for continued employment would

directly conflict with the Kansas Administrators' Act, and that Plaintiffs had no reasonable

expectation of notice before termination other than as provided by the Administrators' Act.

Therefore, the Court must determine whether an administrator's implied contract for continued

employment would conflict with the Administrators' Act.

School districts act only as creatures of the legislature to operate as political subdivisions

of the state.[89]  Thus, "[a] school district has only such power and authority as is granted by the

legislature and its power to contract, including contracts for employment, is only such as is

conferred either expressly or by necessary implication."[90]  "Any attempt by the Board to enter

into a contract . . . in conflict with the Due Process and Administrators' Acts would be ultra vires

and void."[91]

The Administrators' Act provides tenured administrators, principals, and supervisory

personnel with the right to notice and a hearing before nonrenewal of a contract.[92]  However, the

Act does not require a district to support its nonrenewal decision with good cause.[93]  A "tenured

administrator" under the Act means any administrator with two or more consecutive years of

---

[89] *Gragg v. Unified Sch. Dist., No. 287*, 627 P.2d 335, 338 (Kan. Ct. App. 1981).

[90] *Id.* at 339.

[91] *Burk v. Unified Sch. Dist. No. 329,* 646 F. Supp. 1557, 1564–65 (D. Kan. 1986).

[92] *Id.* at 1562; K.S.A. §§ 72-5452, 5453.

[93] *Brown v. Bd. of Educ., Unified Sch. Dist. No. 333*, 928 P.2d 57, 67 (Kan. 1996).

service in the district.[94]  Plaintiffs' complaint alleges that each Plaintiff had worked as an administrator for the district since either 2004 or 2005.  Therefore, each Plaintiff qualified as tenured at the time of the 2014 terminations.  However, the Administrators' Act does not apply to superintendents.[95]  Consequently, any implied contract providing for notice to Superintendent Gilhaus before nonrenewal of his contract would conflict with the Administrators' Act and would be ultra vires and void.  The Court, therefore, dismisses Gilhaus' implied contract claim.

The Court finds that Ziegler and Gerber's implied contract claims would not conflict with the Administrator's Act.  Defendants rely on the District of Kansas case *Burk v. Unified School District No. 329*[96] to argue that any implied contract providing for notice and a hearing before an administrator's nonrenewal would conflict with the Administrator's Act.[97]  In *Burk*, the court held a non-tenured teacher's implied contract invalid because such a contract "would totally obliterate the distinctions carefully drawn by the Kansas Legislature in providing for different procedures for renewal of tenured versus nontenured teachers and principals."[98]  *Burk* does not prevent a school and a tenured administrator from creating implied contractual rights that parallel the rights afforded to tenured administrators under the Act.  Therefore, Ziegler and Gerber's implied contract claims state a plausible claim for relief and shall not be dismissed.

## I.    Conclusion

The Court finds that Gilhaus has stated a claim for relief under § 1983 for deprivation of his due process property interest rights based on termination of his employment contract.

---

[94] K.S.A. § 72-5455.

[95] K.S.A. § 72-5451.

[96] 646 F. Supp. at 1561.

[97] Doc. 10 at 24–25.

[98] *Burk*, 646 F. Supp. at 1561.

Plaintiffs have failed to state a claim for relief under § 1983 for deprivation of their due process liberty interest rights because the court finds Defendants' statements were not stigmatizing. Defendants are not entitled to qualified immunity on Gilhaus' due process property interest claim because the facts as alleged demonstrate that Defendants violated Gilhaus' clearly established constitutional rights.  Plaintiffs have failed to state a claim for relief against Defendant Pam Stranathan for deprivation of Plaintiffs' due process rights under § 1983 because Stranathan did not conspire to deprive Plaintiffs' constitutionally protected rights.

The Court further finds that Plaintiff William Gilhaus has stated a claim for relief for breach of express contract.  However, Gilhaus has failed to state a claim for relief for breach of implied contract.  Plaintiffs Christy Ziegler and Lana Gerber have stated claims for relief for breach of implied contracts.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion to Dismiss is **GRANTED** as to Plaintiffs' Count I due process liberty interest claims, Plaintiffs' Count I due process claims against Defendant Pam Stranathan, and Plaintiff William Gilhaus' Count V breach of implied contract claim.

**IT IS FURTHER ORDERED BY THE COURT** that Defendants' Motion to Dismiss is **DENIED** as to Plaintiff William Gilhaus' Count I due process property interest claim, Plaintiff Gilhaus' Count IV breach of express contract claim, and Plaintiffs Lana Gerber and Christy Ziegler's Count V breach of implied contract claims.

**IT IS SO ORDERED.**

Dated: <u>October 6, 2015</u>

        S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE